# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICE LTD., NICE SYSTEMS INC., and
MATTERSIGHT CORP.,

              Plaintiffs,

   v.

CALLMINER, INC.,

              Defendant.

C.A. No. 18-02024-RGA-SRF

**JURY TRIAL DEMANDED**

---

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT CALLMINER, INC.'S PARTIAL MOTION TO DISMISS

*Of Counsel:*

Gerson S. Panitch
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER, LLP
901 New York Ave., NW
Washington, DC 20001
(202) 408-4000

Jeffrey A. Berkowitz
Joseph M. Schaffner
Alexander M. Boyer
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Dr.
Reston, VA 20190
(571)-203-2700

Dated: April 8, 2019

ASHBY & GEDDES
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ...................................................................................................... 1

III. LEGAL STANDARDS ........................................................................................... 1

    A.    Motion to Dismiss .......................................................................................... 1

    B.    Patent Eligibility ............................................................................................ 2

IV. ARGUMENT ........................................................................................................... 3

    A.    CallMiner Fails to Provide a Meaningful Representativeness Analysis ........ 3

    B.    The '706 and '752 Patents Claim Eligible Improvements in the Field of Telephony Call Monitoring and Recording Systems ...................................... 4

    C.    The '370 and '946 Patents Claim Eligible Improvements in the Field of Telephony Call Recording and Playback Systems ........................................ 9

    D.    The '523 Patent Claims Eligible Improvements in Telephony Monitoring ............... 11

    E.    The '639 Patent Claims Eligible Improvements for Determining the Complexity of Telephony Calls .................................................................... 13

    F.    The '872 Patent Claims Eligible Improvements for Screening Telephone Calls ........ 16

    G.    The '248 Patent Claims Eligible Improvements for Monitoring Call Satisfaction ................................................................................................... 17

    H.    The '400 Patent Claims Eligible Improvements to Call Monitoring and Analysis ........................................................................................................ 18

V.  CONCLUSION ..................................................................................................... 20

**CASES**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)......................................................................... *passim*

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014).......................................................................................2, 3

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016) ......................................................................... *passim*

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016) ......................................................................... *passim*

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018).......................................................................... *passim*

*Cronos Techs., LLC v. Expedia, Inc.*,
    C.A. No. 1-13-1538, 2015 WL 5234040 (D. Del. Sept. 8, 2015)...................... *passim*

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018).......................................................................... *passim*

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018) ......................................................................5, 11, 15

*DDR Holdings LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)..........................................................................19

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)..........................................................................6

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016).......................................................................... *passim*

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016)..........................................................................6

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)..........................................................................14, 19

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)..........................................................................14

*IPA Techs., Inc. v. Amazon.com, Inc.*,
    307 F. Supp. 3d 356 (D. Del. 2018)....................................................................6

*iSentium, LLC v. Bloomberg Finance L.P.*,
    343 F. Supp. 3d 379 (S.D.N.Y. 2018)..................................................................20

*JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*,
    CA No. 16-212, 2016 WL 4639140 (D. Del. Sept. 6, 2016) ..........................2, 3, 4, 8

*Kroy IP Holdings, LLC v. Groupon, Inc.*,
    C.A. No. 17-1405, 2018 WL 4905595 (D. Del. Oct. 9, 2018) ...................... *passim*

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)................................................................. *passim*

*Nice Sys. Inc. v. Witness Sys. Inc.*,
    C.A. No. 06-311 (D. Del. Dec. 14, 2007) ........................................................5, 9

*Olympus Corp. v. Maxell, Ltd.*,
    C.A. No. 18-216, 2018 WL 5962471 (D. Del. Nov. 14, 2018) ..........................2, 18

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008).............................................................................1

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016)........................................................................2

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    No. 2017-2223, 2019 WL 1271160 (Fed. Cir. Mar. 20, 2019)...................... *passim*

*Thales Visionix Inc. v. United States*,
    850 F.3d 1343 (Fed. Cir. 2017) .......................................................................8

*TRUSTID, Inc. v. Next Caller, Inc.*,
    C.A. No. 18-172, 2019 WL 917995 (D. Del. Feb. 25, 2019) ........................ *passim*

*TMI Sols. LLC v. Bath & Body Works Direct, Inc.*,
    C.A. No. 17-965, 2018 WL 4660370 (D. Del. Sept. 28, 2018) ...................... *passim*

*Umland v. Planco Fin. Servs.*,
    542 F.3d 59 (3d Cir. 2008)..............................................................................1

## STATUTES / RULES

35 U.S.C. § 101 ....................................................................................1, 2, 3, 5

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 3

All emphases added unless otherwise indicated.

## I.    INTRODUCTION

CallMiner's motion fails in approach and substance. It seeks to invalidate 205 claims by addressing seven, defending its superficial tack with conclusory, footnoted assertions. It then applies flawed analogies to oversimplified versions of the claims, ignoring wide swaths of the record in the process. CallMiner cannot ask this Court to invalidate patents it refuses to squarely confront. Nor can it ignore properly supported factual allegations that must be accepted as true. Handwaving is not clear and convincing evidence. CallMiner's motion should be denied.

## II.    BACKGROUND

NICE and CallMiner compete in the telecommunications and call analytics fields. NICE filed its original complaint on December 19, 2018, asserting twelve patents. D.I. 1. NICE detailed the technical advances of each patent. *Id.* Following CallMiner's answer (D.I. 12) and partial motion to dismiss (D.I.s 9-11), NICE filed a first amended complaint on March 11, 2019, asserting two additional patents. D.I. 16. CallMiner then filed the partial motion to dismiss at issue here. D.I.s 18-20. CallMiner also filed an answer counterclaiming with two patents in the same field as NICE's patents. D.I. 21 at Ex. A, B. CallMiner contends these patents are "valid and enforceable," D.I. 21 ¶¶ 16, 27, and now seeks to invalidate nine of NICE's patents on § 101 grounds.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). In doing so, the Court must determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). A court can find a patent claim ineligible "if the *only* plausible reading of the patent" shows clear and convincing evidence of ineligibility.

*JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*, C.A. No. 16-212, 2016 WL 4639140, at *1 (D. Del. Sept. 6, 2016); *see also TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, C.A. No. 17-965, 2018 WL 4660370, at *3 (D. Del. Sept. 28, 2018).

### B. Patent Eligibility

A patent claim is ineligible under 35 U.S.C. § 101 if it is directed to an abstract idea and fails to embrace an inventive concept. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). The inquiry presents a mixed question of law with subsidiary questions of fact that "must be resolved" prior to the legal determination. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir.), *reh'g denied*, 890 F.3d 1354 (Fed. Cir. 2018).

Step one requires the Court to consider whether the claim's character, viewed as a whole and in light of the specification, is directed to an abstract idea. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (citations omitted). Courts must avoid oversimplification at this stage, as "all inventions are based upon or touch on abstract ideas." *Olympus Corp. v. Maxell, Ltd.*, C.A. No. 18-216, 2018 WL 5962471, at *3 (D. Del. Nov. 14, 2018) (citing *Alice*, 573 U.S. at 216-17); *Enfish*, 822 F.3d at 1335. Identifying an ineligible concept "underlying the claim" is also insufficient. *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016). A claim is not abstract when it recites a technological improvement to an existing technology, *Enfish*, 822 F.3d at 1337, or focuses on a specific means or method to achieve a desired result, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). The specification is the best source of identifying such improvements. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 2017-2223, 2019 WL 1271160, at *4 (Fed. Cir. Mar. 20, 2019); *McRO*, 837 F.3d at 1313. The inquiry ends if a claim is not directed to an abstract idea under step one. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018).

Even if directed to an abstract idea, a claim remains eligible under step two if its elements

"amount[] to significantly more than a patent upon the [idea] itself." *Alice*, 573 U.S. at 217-18. A claim recites "significantly more" if it involves more than performance of conventional activity. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018). Whether an element is conventional is a question of fact that must be demonstrated by clear and convincing evidence. *Id.* at 1368. At the motion to dismiss stage, these questions must be resolved in the plaintiff's favor. *Aatrix*, 882 F.3d at 1126-27 ("[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)."); *Kroy IP Holdings, LLC v. Groupon, Inc.*, C.A. No. 17-1405, 2018 WL 4905595, at *10 (D. Del. Oct. 9, 2018), *adopted*, 2018 WL 5724013 (D. Del. Nov. 1, 2018).

## IV.  ARGUMENT

CallMiner's motion should be denied. The challenged claims are eligible. And CallMiner fails to show how the seven claims it mentions are representative of the 205 it seeks to dismiss.

### A.  CallMiner Fails to Provide a Meaningful Representativeness Analysis

"A claim is not representative simply because it is an independent claim." *Berkheimer*, 881 F.3d at 1365. Instead, the moving party bears the burden of showing representativeness. *JSDQ*, 2016 WL 4639140, at *2. The movant must address several considerations: (1) whether the representative claim "adequately represent[s]" the others, (2) whether any issue of claim construction must be decided, and (3) whether *any* set of facts could make the claims eligible. *Cronos Techs., LLC v. Expedia, Inc.*, C.A. 13-1538, 2015 WL 5234040, at *2 (D. Del. Sept. 8, 2015). The first consideration requires a "meaningful analysis" for *each challenged claim*. *JSDQ*, 2016 WL 4639140, at *3. Under the second and third considerations, resolution may require claim construction, fact discovery, or both. *Id.* at *3-4.

Here, CallMiner alleges that seven claims fairly represent 205. It tries to sidestep its burden by resorting to conclusory footnotes ignoring claim elements, construction issues, and facts. This

is not a "meaningful analysis." *Id.* at *3; *Cronos*, 2015 WL 5234040, at *3 & n.6 ("legal conclusions combined with quotations of the claim language" are "unhelpful" and insufficient). Nor is CallMiner's methodology accurate. As shown below, many claims raise their own separate eligibility issues. CallMiner ignores them.

CallMiner tries to hide this deficiency by incorrectly declaring that only "claim 1" of each patent is asserted. D.I. 19 at 1-2. This is wrong. *See* D.I. 16 & Exs. 13-24, 28-29 n.1. It is also irrelevant. CallMiner's motion challenges "all of the claims" of the nine patents. D.I. 19 at 20. CallMiner thus bears the burden of showing representativeness for *all 205 claims*. *JSDQ*, 2016 WL 4639140, at *2-3. It has not done so. *See infra*. Thus, the Court should address only claim 1 of the '706, '370, '523, '639, '872, '248, and '400 patents and deny the motion on all other claims out of hand. *JSDQ*, 2016 WL 4639140, at *3-4; *Cronos*, 2015 WL 5234040, at *3-4.

## B. The '706 and '752 Patents Claim Eligible Improvements in the Field of Telephony Call Monitoring and Recording Systems

The '706 and '752 patents recite improvements to telephony monitoring and recording. The claims merge "call records from multiple, disparate data sources [stored] as independent records" based on telephony events from previously-incompatible sources (e.g., real-time, asynchronous, CTI, and SMDR sources). D.I. 16 ¶¶ 103-104, 115-116. Prior fragmented storage methods frustrated the industry, as they "failed to reveal instances when disparate records pertained to the same [call]." *Id*. This impaired recall for call playback, squandered memory and computing resources, and hampered search, archival, and retrieval methods. *Id.*; '752, 7:58-8:8.

The claims address these problems by electronically receiving "***telephony events*** related to one or more telephone calls," and "electronically combining ***event data***" from different sources "into a single call record when ***event data*** . . . is related to the same telephone call." "Telephony events," as previously construed by Judge Farnan in an earlier case, relate actions or occurrences

***detected by a computer program*** describing ***what happens to a phone call*** (e.g., removal of callers, transfer of the call, etc.). *See* Markman Order, *Nice Sys. Inc. v. Witness Sys. Inc.*, C.A. No. 06-311, slip op. at 14-15 (D. Del. Dec. 14, 2007) (D.I. 279) (Ex. 1); *see also* '752, 7:47-8:8. The claims thus use specific means—telephony events—to achieve specific results—creation of a single call record while maintaining recordings on distributed recorders. D.I. 16 ¶¶ 103-104, 115-116; '752, 6:54-7:8. This is a technical solution to a technical problem prevalent in voice recording systems. *SRI*, 2019 WL 1271160, at *4; *McRO*, 837 F.3d at 1315. It also results in a novel data structure— a unified call record tracing event data from incompatible sources—"simplifying and reducing the work necessary to perform search, retrieval, and archival operations." D.I. 16 ¶¶ 103-104, 115-116 (citing, e.g., '752, 29:4-8, 29:40-51). Such data structures "designed to improve the way a computer stores and retrieves data in memory" are patentable. *Enfish*, 822 F.3d at 1339.

CallMiner addresses none of these points. Instead—for these patents and others—it relies considerably on a car dealership analogy plucked from *ClickFox* (D.I. 19 at 1, 5-7, 10, 15, 19) immaterial to the instant patents. 207 F. Supp. 3d at 399. The present case involves different patents with different claims and different specifications. These specifications, not *ClickFox*, are the best sources for assessing eligibility. *See SRI*, 2019 WL 1271160, at *4. And CallMiner's reliance on *ClickFox* is tenuous given further developments in § 101 jurisprudence. *See Kroy*, 2018 WL 4905595, at *11 ("further clarification of the § 101 inquiry" makes related cases of little value). There is nothing to CallMiner's implied suggestion that inventions supporting customer service operations are universally ineligible. *See Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016) (combining customer service information from distributed sources eligible). So while CallMiner is content to analyze its analogy rather than the claim language, "[i]t is not enough . . . to merely trace the invention to some real-world analogy." *Data Engine Techs.*

*LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018). Eligibility hinges instead on examining the actual claim language, properly construed. *Id.*; *Core Wireless*, 880 F.3d at 1362-63.

Here, the plain claim language thwarts CallMiner's analogy. CallMiner's "receptionist" and "salesperson" do not receive "telephony events" detected by computer programs describing what happens to a call from different sources ***to create unified call records***. CallMiner never addresses Judge Farnan's construction of "telephony events" at all, making its failure complete. *Cronos*, 2015 WL 5234040, at *3 (denying a motion to dismiss for failing to address constructions).

Nor do the claims recite "collecting and combining data ***about a customer***" like "car preferences," as CallMiner's analogy suggests. D.I. 19 at 5. The claims do something different. They receive information about what happened to calls—telephony events—and use them to form a "single call record when event data from [different] sources is related to the same telephone call." '706, claim 1. It is not the ***content*** of the calls enabling the improvement, but the telephony events describing what happened to them. Unlike car salesmen, this process enhances "search, retrieval, and archival operations," improves database operations, and controls security access to recordings relating to the same call. *See* D.I. 16 ¶¶ 103-104, 115-16 (citing the patents); '752, 6:47-7:8. The '706 and '752 patents are thus not directed to an abstract idea, let alone one related to car sales, but instead embrace technical solutions to distributed recording systems with an eligible data structure. *SRI*, 2019 WL 1271160, at *4; *McRO*, 837 F.3d at 1315; *Enfish*, 822 F.3d at 1339; *Aatrix*, 882 F.3d at 1127. CallMiner's case law does not control.[1] *See* D.I. 19 at 4-7.

---

[1] Unlike *Elec. Pwr. Grp.*, the claims "require a new source or type of information" (e.g., a new single, unified call record), and "new techniques for analyzing it" (e.g., use of telephony events, confidence factors). 830 F.3d at 1355; *SRI*, 2019 WL 1271160, at *4. And unlike *FairWarning*, they do not claim prior human activity. They also are not "drafted so broadly as to cover any method that can achieve [the goal]." *IPA Techs.*, 307 F. Supp. 3d at 364; *see also id.* at 362-63 (one page of brief insufficient to explain representativeness of claims in three patents).

The claims also recite "significantly more" by using telephony events to match call records and maintain a single call record for recordings across multiple recorders for playback in an unconventional way. D.I. 16 ¶¶ 104, 116; '752, 1:11-3:2, 6:47-7:7, 9:15-11:24, 26:48-27:28, 27:35-29:39. Merging call data from real-time, asynchronous, CTI, and SMDR sources involved "considerable complexity" and was "not a trivial task" due to distinct technical features of these sources, and searching, archiving, live-monitoring, and playback suffered as a result. '706, 9:28-11:24; '752, 27:64-29:24; D.I. 16 ¶¶ 103-104, 115-116. The claimed advances overcoming these problems (and others) are patent-eligible. *See Amdocs*, 841 F.3d at 1300; *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *Aatrix*, 882 F.3d at 1127.

CallMiner never addresses these technical hurdles except to incorrectly assert that the claims do not cover them (D.I. 19 at 7), summarily dismiss them as "[in]significant" (*id.* at n.4), and unremarkably state that CTI and SMDR links exist (*id.* at 8). But the inquiry is not whether these links already existed. The inquiry is whether it was conventional to merge them to create a "single call record" for disparate audio records, and more specifically to do so *in the manner claimed*.[2] *Amdocs*, 841 F.3d at 1300-01; *Bascom*, 827 F.3d at 1350; *TRUSTID, Inc. v. Next Caller, Inc.*, C.A. No. 18-172, 2019 WL 917995, at *2 (D. Del. Feb. 25) (denying motion to dismiss for "collecting and analyzing telephonic information" in "unconventional ways"), *adopted*, 2019 WL 1324948 (D. Del. Mar. 25, 2019); *Kaavo Inc. v. Amazon.com Inc.*, C.A. No. 15-638, 2016 WL 6562038, at *10 (D. Del. Nov. 3, 2016) (denying dismissal for use of "initialization event[s]" in cloud computing setting). It was not. D.I. 16 ¶¶ 103-104, 115-116. And CallMiner's protestations

---

[2] CallMiner similarly tries to dismiss the "real-time" and "asynchronous" elements of the '752 patent as containing allegedly conventional ***content***. D.I. 19 at n.3. That is not the question. Inventive concepts can be found in unconventional uses of existing pieces. *E.g.*, *Bascom*, 827 F.3d at 1350. The question is whether it was conventional to use the real-time and asynchronous sources of this content to create unified call records. It was decidedly not. D.I. 16 ¶¶ 103-104, 115-116.

to the contrary do not rebut by clear and convincing evidence facts deemed true. *Berkheimer*, 881 F.3d at 1368; *TMI*, 2018 WL 4660370, at *8; *Kroy*, 2018 WL 4905595, at *16.

**Finally**, CallMiner has not shown how claim 1 of the '706 patent represents sixty-six claims of the '706 and '752 patents. *See* D.I. 19 at 4-9. CallMiner only addresses claim preambles, *id.* at n.2, and dismisses a single dependent claim limitation as not "add[ing] anything significant," *id.* at n.4. This falls well short of a "meaningful analysis." *JSDQ*, 2016 WL 4639140, at *3.

Claim 1 of the '706 patent is not representative. Claims 6, 9, 24, 27, and 37, of the '706 patent, for example, recite "data normalization threads" combining event data into call records, and "message emitter threads" converting data into specific formats for targeted platforms. Other claims contain similar limitations. *E.g.*, '752 claims 3-4, 6, 12-13, 18-21. The specification explains the technical advantages of these features—normalizing CTI events received from PBX and API interface layers create "a single, common, integrated data format" improving computer programming routines. *E.g.*, '706, 15:48-16:12, 16:63-18:30, 30:46-31:15, Figs. 11-13. Such improvements to computer technology are patentable. *See SRI*, 2019 WL 1271160; *Enfish*, 822 F.3d at 1339; *Bascom*, 827 F.3d at 1350. CallMiner never addresses these elements. D.I. 14 at 4.

Nor is there any force to CallMiner's incurious remark that the claimed "confidence factor" is an "undisclosed algorithm." D.I. 19 at n.4; *see also* '706, claims 2, 10, 13, 17, 20, 24, 26, 27, 29, 30, 32, 36, 42-43, 45; '752, claims 10, 16-17. The patent discloses **columns** of formulae and examples. '706, 9:30-11:33, 6:50-67. This factor helps match disparate call segments based on telephony events, which was "not a trivial task." *Id.*, 3:21-24, 9:30-11:33, 11:11-12; D.I. 16 ¶¶ 115-116. Implementing such factors further bolsters the eligibility of the claims. *See, e.g.*, *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347-48 (Fed. Cir. 2017).

CallMiner also fails to meaningfully address the CTI link and SMDR link limitations of

the patents. *See* '706, claims 8, 11, 25, 28, 38, 41; '752, claims 1-2, 4-9, 14-15. As seen, the specifications chronicle the technical difficulty of combining these sources and forming a unified call record in a distributed environment. *See* '752, 1:54-3:2, 4:66-5:11, 7:9-10:48, 21:5-22, 28:65-29:4, 29:4-8, 29:40-51, Fig. 2; D.I. 16 ¶¶ 103-104, 115-116. Doing so is a technical improvement.

### C. The '370 and '946 Patents Claim Eligible Improvements in the Field of Telephony Call Recording and Playback Systems

The '370 and '946 patents recite technical improvements in the field of telephony recording and playback. D.I. 16 ¶¶ 127-128, 139-140. The claims construct master call records using "telephony events" to match segments of audio data, even those recorded by different recorders. *Id.*; '370, 23:23-36, 28:13-61, 30:31-58. This facilitates "monitoring, recording, and playing back complete telephone calls," enabling recall and remote playback. '370, 3:7-14, 7:19-36, 31:19-32:4, Figs. 15, 16. Recordings remain stored across an enterprise and are recalled using pointers. *Id.* This approach has several advantages. *E.g.*, '370, 62:15-63:4. For example, the claimed "master call record" is a novel data structure improving computers' trace, recall, and viewing capabilities for distributed audio recordings. Such advances are eligible. *E.g.*, *Enfish*, 822 F.3d at 1339.

Despite CallMiner's attempt to obscure these improvements by its car dealership analogy, the claims are not directed to receptionists who "collect[] data and updat[e] data records related to a customer interaction." D.I. 19 at 6-7. They instead use telephony data to determine when multiple segments of audio data across recorders relate to one logical call and define how the segments can be played back on-demand via a "master call record." '370, 7:19-36; D.I. 16 ¶¶ 127-128, 139-140. This addressed problems with storing call data across an enterprise, enabling a logical call to be traced and played from different recorders. *Id.* CallMiner never refutes these benefits, and its case law is inapposite. *See supra* n.1. Moreover, the prior constructions of "telephony events" and "data representations of lifetimes of telephone calls" render CallMiner's analogy nonsensical. *Witness*,

slip op. at 14-17. This is fatal to CallMiner's motion. *Cronos*, 2015 WL 5234040, at \*3.

The claims also recite significantly more, providing unconventional solutions going beyond "collecting data and updating data records." D.I. 19 at 6. The claims identify recordings for one logical call stored at different locations across an enterprise and enable efficient display, access, and playback thereof. D.I. 16 ¶¶ 127-128, 139-140. This allows master call records to "contain[] data matching each call with [] segments of which it is comprised, and match[] the data for each segment with the location of the recording of that segment" for subsequent playback from the location storing each segment. *E.g.*, '370, 3:2-14, 7:9-36. Such advances are eligible (*see Amdocs*, 841 F.3d at 1300; *Bascom*, 827 F.3d at 1350), and survive a motion to dismiss (*Aatrix*, 882 F.3d at 1127; *TRUSTID*, 2019 WL 917995, at \*2). Rather than show how the **claimed method** was known, CallMiner just restates the problem and declares it "routine." D.I. 19 at 8-9. But the specification makes clear no prior process provided this feature—the only resort was fruitless searching. '946, 1:26-35, 23:45-67. The claims therefore do not replace prior manual processes. D.I. 16 ¶¶ 127-128, 139-140. Instead of an efficiency gain, it was a different process altogether. *McRO*, 837 F.3d at 1314 (prior activity not within claim scope). CallMiner's unsupported "routine" assertions do not overcome the specifications' teachings. *E.g.*, *Berkheimer*, 881 F.3d at 1368.

***Lastly***, CallMiner fails to show how claim 1 of the '370 patent represents every claim of the '946 and '370 patents. D.I. 19 at 6-9. Claims 14 and 25 of the '370 patent, for example, invoke "handler routines corresponding to [a] telephony event" to update matching call records. Claims 8 and 19 "assembl[e] and play[] back segments of telephone calls using the recorder locations described in the master call record for each telephone call." Claims 9-11 and 20-22 "us[e] the master call record to display a graphical representation of said telephone call." And claims 4 and 16 use "confidence factor algorithm[s]" to determine "whether a match has been found."

These limitations are significant. The handler routines provide means to update call records in real-time as telephony events are detected. *E.g.*, '370, 26:5-28:12, 11:33-12:37, Fig. 3. Assembling, playing back, and visualizing segments of a master call record are far more than "generic" (D.I. 19 at n.4.). *See* D.I. 16 ¶¶ 127-128; '370, 2:41-54, 30:31-42, 21:66-22:44. The patent explains, for example, how early binding of the audio and CTI data enables playback and archiving of telephone call segments was less "complicated and prone to error." *Id.*, 30:32-31:18. These limitations enhance computer-specific "search, retrieval, and archival operations." *Id.*, 30:59-31:18. Such improvements are patentable. *E.g.*, *Enfish*, 822 F.3d at 1339; *Aatrix*, 882 F.3d at 1126-28. CallMiner's car dealership analogy cannot account for these improvements.

Other claims of the '946 patent similarly go unmentioned or dismissed without explanation. *See* D.I. 19 at n.4. These claims include, *inter alia*, "using the master call record to display a graphical representation of said telephone call," (claim 6), and "translating the data regarding telephony events into a platform-specific format," (claims 3 and 4). These technical features provide a unified interface with their own technical advantages. *E.g.*, '946, 33:34-36:27; *see also id.*, 16:23-57 (describing normalizing and translating), 17:46-19:3, 34:17-49; D.I. 16 ¶¶ 139-140. These are eligible too. *Data Engine*, 906 F.3d at 1008-09; *Core Wireless*, 880 F.3d at 1362-63.

### D. The '523 Patent Claims Eligible Improvements in Telephony Monitoring

The '523 patent provides eligible improvements to the field of call center data monitoring. D.I. 16 ¶¶ 163-164. The claims separate call recordings into constituent voice data between speakers and convert them to text data. '523, 2:43-54, 9:21-26, Fig. 10. The data is analyzed for objects based on spoken words. *Id.*, 16:6-27, 19:26-40. The objects are classified, including analyzing adjacent objects for perspective. *Id.*, 17:1-22. Segments of the recorded communication are created and compiled for subsequent review. *Id.*, 16:28-65. These segments are determined based on like objects, where the objects may include "text-based keywords" relevant to

"predefined type categories." *Id.*, 16:1-5. This provides a special machine that breaks down communications into objects and segments classified into categories for analysis. *Id.*, 2:4-11.

The claims capture these concepts. They recite processing telephonic communications into "computer telephony interpretation events" (claims 1, 15), processing these communications into "constituent voice data" (claims 7, 14, 15), analyzing the voice data to form "communication objects," classifying these objects and events into "types," forming "segments" of the objects using type classes (claim 14), and analyzing classification trends over time (claims 4-5, 11-12). *See also* '523, 2:44-48, 9:21-26. As one example, the claims analyze spoken words to classify segments of a call as a "negotiation," and further process those segments to objectively rate the strength of the parties' negotiations. *See* '523, 17:41-18:9, Figs. 17-18, claims 4-5, 10-12, 18-19. Contrary to CallMiner's inapt secretary analogy and cited cases, the claims are "more complex than merely reciting the performance of a known business practice . . . and are better understood as being necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks." *SRI*, 2019 WL 1271160, at *4; *Core Wireless*, 880 F.3d at 1362; *McRO*, 837 F.3d at 1315. The claims are eligible for reciting ***how*** to categorize telephone conversations and segment audio. They do not cover the entire idea of analyzing audio data for "training needs."[3]

CallMiner's inventive concept analysis is similarly conclusory. D.I. 19 at 13-14. It improperly focuses on the sheer existence of hardware elements without addressing the claims. *See Amdocs*, 841 F.3d at 1300-01; *Bascom*, 827 F.3d at 1350. CallMiner then asserts that the claims fail to provide "any particular instruction," D.I. 19 at 13, but this too is wrong. As seen, the claims process "telephony interpretation events" in telephonic communications, forming and classifying

---

[3] That a rejection was overcome during prosecution is irrelevant. *See* D.I. 19 at 10. In any event, the USPTO has affirmed eligibility of "practical application[s]" of ideas. 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019). The claims here do just that.

"objects" from constituent voice data, generating "segments" of classified objects, and analyzing classification trends over time. The claims use these features to arrive at the claimed technical solution—e.g., **objectively** determining segments of audio from like objects for analysis. *See McRO*, 837 F.3d at 1313-15. Forming objects from voice data, classifying the objects into types, and using them to collect audio segments for analysis was unconventional at the time and overcame the subjective determinations used in prior methods. D.I. 16 ¶¶ 163-164; '523, 1:50-2:17, 16:28-32, 18:38-41, 8:49-9:3. CallMiner has no response. *Berkheimer*, 881 F.3d at 1368; *TRUSTID*, 2019 WL 917995, at *2; *Kroy*, 2018 WL 4905595, at *16. CallMiner also glosses over these limitations before claim construction sheds light on their scope. *Cronos*, 2015 WL 5234040, at *3.

Finally, CallMiner hastily brands all claims of the '523 patent as "similar" to claim 1. D.I. 19 at n.5. As seen, they are not. Claims 7, 14, and 15, for example, recite "processing said telephonic communication into constituent voice data," "analyzing said constituent voice data to form communication objects," "classifying the communications objects into types," and "forming segments of communications objects based on said classifying." These technical features envision separating audio segments by speaker, '523, 8:21-48, and translating communications into text before classifying the data into objects and forming segments based on the objects, *id.*, 16:6-17:22. These process a telephonic communication by "breaking down an interaction into objects and categories" to provide "accurate measures" of agent quality and classification. D.I. 16 ¶¶ 163-164.

### E. The '639 Patent Claims Eligible Improvements for Determining the Complexity of Telephony Calls

The claims of the '639 patent recite unconventional improvements in the field of telephony call processing by determining the complexity of a call using determined "call attributes." D.I. 16 ¶¶ 176-177. The claims compare these attributes to "call rule[s]" and create "output data indicative of the complexity of the telephonic communication." The systems determine call complexity by

analyzing behavioral measures like distress. '639, 15:39-45. The systems then generate graphical interfaces displaying "time-based representation[s] . . . of the call attributes." Calls are categorized into "call sets" and generate output data indicating whether call sets are self-service eligible.

These innovations provide several technical advantages. D.I. 16 ¶¶ 176-177. For one, enterprises can analyze the complexity of telephonic communications in large scales and manage the future handling of like calls. '639, 1:28-66, 15:12-25; *see also id.*, 16:14-35. The claimed solution is not abstract but instead provides a specific process for objectively handling complex calls. *McRO*, 837 F.3d at 1315 (specific rules render information into a specific format to create desired results). This eliminates subjective bias by using call rules with defined thresholds (e.g., silence thresholds, distress event thresholds, etc.). '639, 2:7-41. The specification further discloses extracting call attributes using nonlinguistic analytical tools to generate event data and/or categorize communications, *id.*, 14:8-15:7, translating voice data to text format, *id.*, 13:36-44, and generating behavioral and/or distress assessment data, *id.*, 14:46-15:7. The output enables viewing calls with the determined attributes and determining self-service eligibility. *Id.*, 16:1-13, 15:8-25. This is not abstract. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018) (behavior-based solution enabling computer "to do things it could not do before" is eligible).

CallMiner's allegation that the claims just automate human activity (D.I. 19 at 11-12) is both irrelevant and wrong. It is irrelevant because tasks that "could only be produced by human[s]" can remain eligible. *McRO*, 837 F.3d at 1313. And it is wrong because a pen and paper cannot assess behaviors like silence and distress levels. CallMiner cites to *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016), but that case involved claims reciting "a database of business rules" such as "releasing, deleting, returning, or forwarding" emails. The claims here are not merely "business rules"—they focus on measuring call complexity from the tone and nature

of voice data. And CallMiner's longwinded footnotes making unremarkable points about how generic GUIs and programs may be abstract (*see* D.I. at nn. 6, 8) do not show how **the claimed computer program** using **the claimed process** with **the claimed interface** is abstract.

The claims of the '639 patent also recite significantly more. Processing calls based on specific rules involving, *inter alia*, detected stress events was unconventional. D.I. 16 ¶¶ 176-177. CallMiner presents no evidence to the contrary. Instead, it asserts—without explanation—that the claims do not "specif[y]" the described advantages. D.I. 19 at n.9. This is demonstrably false. The claims expressly recite "generating a graphical user interface . . . including graphical representation of the call attributes," which comprise items like "distress event data" and silence data. *See* '639, claims 1, 3, 7, 12. Specific interfaces addressing technical problems are eligible. *Data Engine*, 906 F.3d at 1008-09; *Core Wireless*, 880 F.3d at 1362-63. Perhaps sensing this result, CallMiner shift gears by asserting—also without explanation—that such interfaces are "generic." D.I. 19 at n.6. CallMiner supplies no evidence for this declaration, and it is wrong. D.I. 16 ¶¶ 176-177. Such causal dismissals cannot rebut, let alone by clear and convincing evidence, factual statements propounding the claims' unconventionality. *Aatrix*, 882 F.3d at 1126-29; *Berkheimer,* 881 F.3d at 1368; *TRUSTID*, 2019 WL 917995, at *2; *TMI*, 2018 WL 4660370, at *8.

Nor does CallMiner meaningfully address other claims of the patent. D.I. 19 at n.7. Omitted elements include, for example, determining "call attributes" from behavioral patterns revealing "distress event[s]" in speech (claims 2, 3, 7, 12), "automatically and dynamically generat[ing]" classification rules on-the-fly based on complexity routines (claims 4 and 10), and identifying self-service calls based on complexity (claims 8 and 13). The specification explains how these features use specific rules (e.g., databases correlating call type data based on spoken words) to achieve technical results. '639, 14:8-31,15:12-25 (explaining self-service handling and "recalibrat[ing] the

call rule"); D.I. 16 ¶¶ 175-176. These advancements are eligible. *McRO*, 837 F.3d at 1314-16.

F.    **The '872 Patent Claims Eligible Improvements for Screening Telephone Calls**

CallMiner incorrectly alleges that claim 1 of the '872 patent is an "age-old business process of evaluating a salesperson's interaction with a customer." D.I. 19 at 15. But the claims do not embody "evaluating a salesperson" or filling out evaluation forms. Nor is this found in the specification. The claims instead recite a process for automatically monitoring "quality task parameters" associated with interactions and detecting a breach of a "key performance indicator (KPI)" in an objective manner. D.I. 16 ¶¶ 91-92. The detected breach triggers selection of call interactions "relati[ng] to the quality task" and "displaying" graphical representations of the identified recordings. Unlike CallMiner's assertions, automatic selection of appropriate recordings and presentment of specific interfaces upon a triggering event is not merely "human activity." D.I. 19 at 14-15. Nor are the claims directed to "evaluating customer-salesperson interactions." *Id.* at 14. The claims instead "screen[] calls for evaluation in a quantitative and automated fashion when those calls satisfy certain quality metrics." D.I. 16 ¶ 91; *McRO*, 837 F.3d at 1314 (claimed rules and not mere use of computer improves existing technological process) (quotations omitted)).

The claims also recite significantly more by automatically selecting, classifying, and presenting calls for evaluation using an array of quantitative metrics. D.I. 16 ¶ 92 (citing '872, 1:24-40, 3:19-46, 3:63-4:6, 6:58-62). The '872 patent overcame the prohibitive complexity of retrieving, analyzing, quantitatively rating, and automatically pushing critical call data in an extensive universe of raw data. *Id.* This enables proactively pushing analyses directly to quality reviewers, obviating conventional subjective, wasteful approaches. *Id.*; '872, 3:32-46 (push vs. pull), 3:3-31 (selecting calls is "extremely complicated if not impossible"). The automatic selection of calls using objective criteria to determine breaches of quality metrics, is an eligible, unconventional solution for screening calls for evaluation in a call center environment. *TRUSTID*,

2019 WL 917995, at *2. CallMiner fails to carry its burden of proving otherwise. *Berkheimer*, 881 F.3d at 1368; *TRUSTID*, 2019 WL 917995, at *2; *TMI*, 2018 WL 4660370, at *8.

CallMiner incorrectly alleges the '872 patent claims merely include "variations on the abstract idea." D.I. 19 at n.11. Not so. For example, claim 3 recites categorizing recordings and applying sets of key performance indicators to the categories. Claim 13 recites "automatically modifying a definition of a [key performance indicator] according [to] evaluation results." This ensures the key performance indicator continually adapts to new data. '872, 12:35-13:17. Such real-time monitoring solutions are further eligible. *See, e.g.*, *SRI*, 2019 WL 1271160, at *4.

G.    **The '248 Patent Claims Eligible Improvements for Monitoring Call Satisfaction**

CallMiner alleges another "age-old business practice" for the claims of the '248 patent, this time covering a "salesperson identifying the perceived satisfaction of a customer." D.I. 19 at 17. Yet CallMiner concedes that the "patent describes ***how*** customer satisfaction can be evaluated based on certain characteristics of a call, such as the duration of a call and the hold time during a call." *Id.* That is what is claimed. Rather than claiming the subjective human perception of customer satisfaction in general, the claims recite how to perform "an ***objective*** assessment or rating of the quality, satisfaction or appropriateness of the interaction between an agent and a customer." '248, 22:57-23:10; D.I. 16 ¶ 151. Claim 1 thus extracts caller event data from an interaction event, selects categories for the event data, and determines objective indicia of satisfaction based on the categories. The claims apply a linguistics model to objectively "categorize[]" behavioral characteristics by "words, tones, gestures, postures and facial expressions." '248, 20:8-65. Nonlinguistic indicators, such as hold times, transfers, dead-air, and overtalk, are used to "augment or confirm the selection of a style for each segment of speech." *Id.*, 20:8-21:3. This rules-based approach to determining caller satisfaction based on caller event data, including linguistic and nonlinguistic indicators, enables computers to engage tasks not performed

by humans. *See McRO*, 837 F.3d at 1313; *id.* at 1314 (eligible where no evidence establishes prior process is the same as required by the claims). These claims are patent-eligible.

The claims also recite significantly more by providing an unconventional monitoring process automatically subjecting call data to behavioral models for deducing and categorizing human behaviors. D.I. 16 ¶ 152. This collects "a customer's perception of an interaction during a call." '248, 1:55-2:7 (replacing "post-call data collections" surveys). CallMiner's two sentences to the contrary focus on the broad existence of computer code, storage mediums, and software. D.I. 19 at 20. CallMiner does not show how this was a conventional process sufficient to invalidate the claims on a motion to dismiss. *Berkheimer*, 881 F.3d at 1368; *Bascom*, 827 F.3d at 1350.

Nor does CallMiner address other claims of the '248 patent. D.I. 19 at n.12. It ignores, *inter alia*, "separating an audio waveform of the caller interaction event after extracting the caller event data" (claim 6), "determining caller distress by conducting distress analysis of voice data associated with the caller from the recorded caller interaction event" (claims 8, 16, and 24), "generating a caller satisfaction score" (claims 9 and 25), and "generating a visual statistics link for displaying caller interaction event statistics" (claims 10 and 26). CallMiner curiously asserts that these claims are "directed to **the application** of abstract concepts," D.I. 19 at n.12, but then fails to articulate how they are actually abstract. *Olympus*, 2018 WL 5962471, at *3 ("[A]ll inventions are based upon or touch on abstract ideas."). They are not. Prior systems "could not determine a customer's satisfaction level . . . in an objective, automated, and reliable manner" (D.I. 16 ¶¶ 151-152), and these processes thus embrace eligible, technical solutions to problems in the call recording and monitoring field. *See McRO*, 837 F.3d at 1313-16.

### H.    The '400 Patent Claims Eligible Improvements to Call Monitoring and Analysis

The '400 patent addressed several problems in the field of call center analytics. D.I. 16 ¶¶ 199-200. Rather than claiming the concept of "evaluating customer-salesperson interactions"

as alleged, D.I. 19 at 18, the claims instead recite a useful application of analyzing electronic communications, recognizing behavioral patterns, and enhancing interactions based on these assessments. '400, claim 1. The claims do so by mining data from unconventional sources—such as social media feeds, web data, or chat feed data—and analyzing it along with text-translated voice data to generate behavioral assessments of customers. *Id.* These assessments may employ psychological behavioral models as well as speech patterns identifying distress and escalation. *Id.*, 15:6-40, 17:62-19:6, 19:21-41, 21:28-67, 29:20-43; D.I. 16 ¶ 200. The behavioral data helps generate graphical representations "providing a behavioral analytics alert" during or after a communication between agents and customers. *Id.*, 19:28-20:17, 31:31-50. These behavioral assessments provide context of a customer's interaction and intent. *Id.*, 20:6-45.

CallMiner reductively dismisses this entire process as mere "data manipulation." D.I. 19 at 18-19. This superficial analysis, wholly untethered to the claim language, proves too much. Accumulating and using "newly available, behavior-based information" to achieve specifics results are eligible. *Finjan*, 879 F.3d at 1305-06. So too are claims "rooted in computer technology" like those involving elements having no pre-computer analogue such as social media data streams. *DDR Holdings LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). And multichannel behavioral analyses of electronic transmissions provide a practical application of enabling objective behavioral assessments to improve communications. '400, 22:9-20. Such specific claims are eligible. *SRI*, 2019 WL 1271160, at *4. Instead of just reciting a result, claim 1 recites **how** to accomplish it, *McRO*, 837 F.3d at 1314; *Finjan*, 879 F.3d at 1305-06, and encompasses routines more specific than just "how to handle future interactions," D.I. 19 at 19.

Claim 1 also recites significantly more. It provides an unconventional evaluation of customer behavior using different data channels to alert customer service agents. D.I. 16 ¶ 200

(citing '400, 8:8-21, 12:12-25, 15:6-40, 14:25-43). CallMiner fails to rebut this. *Berkheimer,* 881 F.3d at 1368; *TRUSTID*, 2019 WL 917995, at *2. Instead, CallMiner's "inventive concept" assertions again focus on the existence of hardware, social media, and behavioral models. *See* D.I. 19 at 20. Once again, the question is not whether social media platforms exist, but instead whether it was conventional to use them with all of the other claimed elements **in the claimed manner**. *Amdocs*, 841 F.3d at 1300-01; *Bascom*, 827 F.3d at 1350. It was not. D.I. 16 ¶ 200. CallMiner fails to show otherwise, let alone by clear and convincing evidence. *Berkheimer*, 881 F.3d at 1368; *Aatrix*, 882 F.3d at 1126-29; *TMI*, 2018 WL 4660370, at *8; *Kroy*, 2018 WL 4905595, at *16. The claims apply targeted data collection and analysis to achieve the technical result of providing alerts regarding a customer from analysis of information feeds and contemporaneous behavioral assessments—all programmatically undertaken on the fly. D.I. 16 ¶ 200. Unlike CallMiner's cited *iSentium, LLC v. Bloomberg Finance L.P.*, claim 1 does not merely "transform[] . . . one type of data into another," without more. 343 F. Supp. 3d 379, 392 (S.D.N.Y. 2018). The claims mine **specific types of data** subsisting in **specific channels** to make **specific types of assessments** to provide **specific applications** of its analysis to achieve **specific results**.

CallMiner's flyover of the '400 patent also ignores its dependent claims. D.I. 19 at n.14. These claims recite, for example, extracting "behavioral assessment data" by analyzing "video data including [] voice data" or "image data" on social media feeds (claims 2, 3, 12, 13), including "analyzing one or more of the customer's words, tones, gestures, posture, and facial expressions," (claims 4 and 14). CallMiner dismisses these advances as mere "forms of human activity." But analyzing facial tones, expressions, and gestures is not abstract. *See McRO*, 837 F.3d at 1313-16.

## V. CONCLUSION

For the above reasons, CallMiner's motion should be denied.

ASHBY & GEDDES

*/s/ Steven J. Balick*

_____

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Of Counsel:*

Gerson S. Panitch
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER, LLP
901 New York Ave., NW
Washington, DC 20001
(202) 408-4000

*Attorneys for Plaintiffs*

Jeffrey A. Berkowitz
Joseph M. Schaffner
Alexander M. Boyer
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Dr.
Reston, VA 20190
(571)-203-2700

Dated:  April 8, 2019