# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICE LTD., NICE SYSTEMS INC., and ) 
MATTERSIGHT CORP. )
)
       Plaintiffs, )
)
       v. )    Civil Action No. 18-2024-RGA-SRF
)
CALLMINER, INC., )
)
       Defendant. )

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Presently before the court in this patent infringement action is the partial[1] motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by defendant CallMiner, Inc. ("CallMiner").[2] (D.I. 18) For the following reasons, I recommend that the court DENY the pending motion.

## II.    BACKGROUND

Plaintiffs NICE Ltd., NICE Systems Inc., and Mattersight Corporation (collectively, "plaintiffs" or "NICE") filed this suit on December 19, 2018, alleging infringement of fourteen patents directed to improving call recording systems. (D.I. 1) NICE is the assignee of U.S. Patent Nos. 6,246,752 ("the '752 patent"), 6,252,946 ("the '946 patent"), 6,785,370 ("the '370 patent"), and 6,937,706 ("the '706 patent") (collectively, the "Data Collection Patents"); U.S. Patent Nos. 8,611,523 ("the '523 patent") and 8,023,639 ("the '639 patent") (collectively, the "Call Classification Patents"); U.S. Patent Nos. 8,553,872 ("the '872 patent"), 9,942,400 ("the

---

[1] CallMiner's partial motion to dismiss alleges that nine of the fourteen patents-in-suit are directed to unpatentable subject matter pursuant to 35 U.S.C. § 101. (D.I. 18)

[2] The briefing and related filings associated with the pending motion are found at D.I. 19, D.I. 20, D.I. 22, D.I. 23, and D.I. 28.

'400 patent, and 10,021,248 ("the '248 patent") (collectively, the "Call Evaluation Patents"); and five other patents which are not at issue in CallMiner's pending motion to dismiss: U.S. Patent Nos. 7,599,475, 7,714,878, 8,204,884, 8,694,307, and 10,104,233 (together with the Data Collection Patents, the Call Classification Patents, and the Call Evaluation Patents, the "patents-in-suit"). (D.I. 16 at ¶ 1) In the amended complaint, NICE alleges that CallMiner infringes claim 1 of each of the fourteen patents-in-suit. (D.I. 16)

On March 25, 2019, CallMiner filed the instant partial motion to dismiss, alleging that nine of the fourteen patents-in-suit are directed to unpatentable subject matter pursuant to 35 U.S.C. § 101. (D.I. 18) Specifically, CallMiner contends that the '872, '752, '706, '370, '946, '248, '523, '639, and '400 patents should be rendered invalid. (*Id.*; 9/5/19 Tr. at 5:1-3)

## III.    LEGAL STANDARDS

### A.    Failure to State a Claim

CallMiner moves to dismiss the pending action pursuant to Rule 12(b)(6), which permits a party to seek dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). According to CallMiner, NICE's amended complaint fails to state a claim because the asserted claims of the patents-in-suit are ineligible for patent protection under 35 U.S.C. § 101. Patent eligibility under 35 U.S.C. § 101 is a threshold test. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Therefore, "patent eligibility can be determined at the Rule 12(b)(6) stage . . . when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff.

*Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). Dismissal under Rule 12(b)(6) is only appropriate if the complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). However, "a court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (quoting *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 931 (Fed. Cir. 2014)).

### B.   Patent-Eligible Subject Matter

Section 101 of the Patent Act provides that patentable subject matter extends to four broad categories: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court recognizes three exceptions to the subject matter eligibility requirements of § 101: laws of nature, physical phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014). The purpose of these exceptions is to protect the "basic tools of scientific and technological work," *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012), which are "part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to none," *Bilski*, 561 U.S. at 602 (internal quotation marks and citations omitted).

The Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible

3

applications of those concepts." *Alice*, 573 U.S. at 217; *see also Mayo*, 566 U.S. at 77-78. At step one, the court must determine whether the claims are directed to one of the three patent-ineligible concepts. *Alice*, 573 U.S. at 217. If the claims are not directed to a patent-ineligible concept, "the claims satisfy § 101 and [the court] need not proceed to the second step." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018). If the claims are directed to a patent-ineligible concept, the court must proceed to the second step by identifying an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 218-19 (quoting *Mayo*, 566 U.S. at 72-73).

At step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."). However, "courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (internal quotation marks omitted). "At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; [courts] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).

At step two, the court must "look to both the claim as a whole and the individual claim elements" to determine whether they "amount[ ] to significantly more than a patent upon the

4

ineligible concept itself." *McRO*, 837 F.3d at 1312. "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 573 U.S. at 222 (internal quotation marks omitted). Instead, the claim elements must "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (citation and internal quotation marks omitted); *see also Mayo*, 566 U.S. at 73. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. . . . [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

## IV. DISCUSSION

In resolving CallMiner's motion to dismiss, the court will first discuss which claims are sufficiently representative. Thereafter, it will analyze the relevant claims under both steps of the test for patent eligibility set out in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), taking into account whether any factual disputes preclude granting CallMiner's motion.

### A. Representative Claims

As a preliminary matter, the court addresses the parties' disagreement regarding whether the seven claims specifically addressed by CallMiner in its briefing are adequately representative of the remaining claims of the nine patents subject to CallMiner's motion to dismiss.[3] The Federal Circuit has held that "[c]ourts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance

---

[3] NICE points out that CallMiner seeks to invalidate 205 claims across nine patents by challenging seven as "representative" of all. (D.I. 22 at 1, 3)

of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 & n.9 (Fed. Cir. 2016)). Although not much has been written regarding which party bears the burden to show claim representativeness, at least one court in the Eastern District of Texas has recently proposed a burden-shifting analysis to resolve disputes regarding the representativeness of a particular claim. *See PPS Data, LLC v. Jack Henry & Assocs., Inc.*, 404 F. Supp. 3d 1021, 1029-30 (E.D. Tex. 2019). The court finds persuasive this burden-shifting framework, which is intended to protect the procedural due process rights of patentees by protecting against the deprivation of property rights without a meaningful opportunity to be heard. *Id.* at 1032.

Under this framework, the defendant bears the initial burden of persuasion to justify treating the claims as representative of other asserted claims because each claim must be presumed independently valid. *PPS Data*, 404 F. Supp. 3d at 1030 (citing 35 U.S.C. § 282). The defendant's showing on representativeness must be "directly tethered to the claim language." *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019). Moreover, a claim is not representative just because it is an independent claim or because it generally deals with the same subject matter as the other asserted claim. *See PPS Data*, 404 F. Supp. 3d at 1031 (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016); *Berkheimer*, 881 F.3d at 1365). If the defendant overcomes the presumption and demonstrates representativeness, the burden shifts to the plaintiff to identify limitations in the asserted claims which are absent from the allegedly representative claim. *PPS Data*, 404 F. Supp. 3d at 1031-32. "[I]f the plaintiff identifies legally distinctive limitations, then any claims which contain those limitations

6

are excluded from the scope of the relief sought by the defendant and must be distinctively addressed." *Id.* at 1032 (citing *Berkheimer*, 881 F.3d at 1365).

Claim representativeness is the exception, rather than the rule, because "different patents must generally contain patentably distinct inventions" in accordance with the obviousness-type double patenting doctrine. *PPS Data*, 404 F. Supp. 3d at 1031 (citing *Novartis Pharm. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1362 (Fed. Cir. 2018)). Erroneously determining that a claim is representative has constitutional consequences. *Id.* at 1033. In contrast, an erroneous determination that a claim is not sufficiently representative "presents no comparable counterweight" because "incremental increases in judicial economy . . . should never come at the cost of constitutionally secured rights." *Id.*

By way of its motion to dismiss, CallMiner seeks to invalidate the '872, '752, '706, '370, '946, '248, '523, '639, and '400 patents in their entirety pursuant to 35 U.S.C. § 101. (D.I. 18; D.I. 18-1) CallMiner's motion to dismiss is therefore not limited to the asserted claims identified in the amended complaint. (D.I. 19 at 1-2) ("In its Amended Complaint, NICE alleges that CallMiner infringes a single claim – claim 1 – of each of fourteen patents-in-suit."). CallMiner bears the initial burden to justify treating the identified claims as representative of the remaining dependent and independent claims to overcome the presumption of validity. *PPS Data*, 404 F. Supp. 3d at 1030 (citing 35 U.S.C. § 282).

CallMiner has satisfied its burden to show that claim 1 of the '706 patent is representative of claim 1 of the '752 patent. CallMiner notes that the patents share a specification and the claims are nearly identical. (D.I. 19 at 4-5) CallMiner acknowledges that the '752 patent contains additional limitations reciting that data from one source is "real-time data" and data from a second source is "asynchronous data." (*Id.*) However, CallMiner claims that the

7

additional limitations in the '752 patent do not impact the § 101 analysis.[4] (*Id.* at 5 n.3; 9/5/19 Tr. at 14:10-15:7)  The chart at Appendix A supports CallMiner's arguments by showing that the claims are identical, with the exception of two "wherein" clauses at subsections (a) and (b) of the '752 patent: (a) . . . wherein said data from said first source is real time data; (b) . . . wherein said data from said second source is asynchronous data."  (D.I. 19, App'x A at 1)  NICE fails to satisfy its burden of showing how the additional limitations in claim 1 of the '752 patent are legally significant to the § 101 motion, instead focusing its argument on the dependent claims of the '706 and '752 patents.  (D.I. 22 at 8-9)

CallMiner has also satisfied its burden to show that claim 1 of the '370 patent is representative of claim 1 of the '946 patent.  CallMiner notes that the patents share a specification and the claims are nearly identical.  (D.I. 19 at 6)  CallMiner acknowledges that the '946 patent contains the additional limitation that the received data comprises "event data . . . describing the duration of the telephone call."  (*Id.*)  However, CallMiner claims that the additional limitation in the '946 patent does not impact the § 101 analysis.  (*Id.* at 7)  The chart at Appendix A shows that the claims are identical, with the exception of an additional clause at subsection (d) of the '946 patent: (d) . . . said received telephony event data comprising data describing the duration of the telephone call."  (D.I. 19, App'x A at 2)  NICE fails to satisfy its burden of showing how the additional limitation in claim 1 of the '946 patent is legally significant to the § 101 motion, instead focusing its argument on limitations in the dependent claims of the '370 patent and other independent claims of the '946 patent.  (D.I. 22 at 10-11)

---

[4] Courts have observed that the recitation of a certain specific type of data does not necessarily alter the § 101 analysis and render an abstract idea patent-eligible. *See, e.g.*, *Kaavo Inc. v. Amazon.com Inc.*, C.A. No. 15-638-LPS-CJB *et al.*, 2016 WL 6562038, at *12 (D. Del. Nov. 3, 2016) (noting that recitation of "certain types of data . . . to effect the overall method or goal" does not amount to an inventive concept).

CallMiner fails to satisfy its burden to show that each identified claim is sufficiently representative of the remaining independent and dependent claims in each patent. For example, the '706 patent has forty-five claims, and the '752 patent has twenty-one claims. ('706 patent, cols. 60:28-64:52; '752 patent, cols. 62:48-64:55) CallMiner argues that claim 1 of the '706 patent is representative because "[t]he remaining independent claims of the '752 and '706 Patents claim similar methods and also recite generic or non-transitory 'computer program' elements or an 'article of manufacture.'" (D.I. 19 at 4 n.2) The law is clear that "a claim is not representative merely because it generally deals with the same subject matter as the other asserted claims." *PPS Data*, 404 F. Supp. 3d at 1031. CallMiner's one-line explanation regarding how claim 1 of the '706 patent is representative of the sixty-four remaining claims in the '706 and '752 patents is not sufficiently "tethered to the claim language." *Solutran*, 931 F.3d at 1168. In contrast, NICE identifies specific claim limitations in the non-representative claims and portions of the specification explaining the technical advantages of these features which were not addressed by CallMiner. (*See, e.g.*, D.I. 22 at 8) For these reasons, claim 1 of the '706 patent is not representative of the remaining dependent and independent claims of the '706 and '752 patents. The same is true for the remaining claims of the seven other patents subject to CallMiner's motion to dismiss. (D.I. 19 at 6 n.4, 9 n.5, 11 n.7, 15 n.11, 17 n.12, 18 n.14)

For these reasons, the Report and Recommendation applies to claim 1 of each of the '872, '752, '706, '370, '946, '248, '523, '639, and '400 patents. All other claims of these patents are excluded from the scope of the Report and Recommendation. *See PPS Data*, 404 F. Supp. 3d at 1045.

9

**B.     Data Collection Patents**

**1.     The '752 and '706 patents**

Claim 1 of the '706 patent recites:

A method of recording telephone call information comprising:

(a) electronically receiving data from a first source regarding telephony events related to one or more telephone calls;

(b) electronically receiving data from a second source regarding telephony events related to one or more telephone calls; and

(c) electronically combining event data from said first source and event data from said second source into a single call record when event data from said first and second sources is related to the same telephone call.

('706 patent, col. 60:28-39)  The '752 patent additionally recites that data from one source is "real-time data," and data from a second source is "asynchronous data." ('752 patent, col. 9:36-45)

**a.     *Alice* step one**

In support of the motion to dismiss, CallMiner contends that the '752 and '706 patents are directed to the abstract idea of recording data related to telephone calls from multiple sources and combining the data into a single recording.  (D.I. 19 at 4)  In response, NICE alleges that the '752 and '706 patents are not directed to an abstract idea because they recite improvements to telephony monitoring and recording by claiming methods of merging data from previously-incompatible real-time, asynchronous, CTI, and SMDR sources.  (D.I. 22 at 4, 7)

Claim 1 describes the abstract idea of recording data related to telephone calls from multiple sources and combining the data into a single recording.  This distillation of the abstract idea closely tracks the claim language: "A method of recording telephone call information comprising: (a) electronically receiving data from a first source . . .; (b) electronically receiving

data from a second source . . .; and (c) electronically combining event data from said first source and event data from said second source into a single call record." ('706 patent, col. 60:27-39) Consistent with this articulation of the abstract idea, the specification provides that "[t]he present invention is directed to a system and method that is capable of simultaneously monitoring two or more data links, gathering information about calls from those data links, and combining that information into a single data model of the telephony activity within the call center." ('706 patent, col. 3:9-13) Where, as here, the abstract idea accurately captures the focus of the claimed invention, characterizing the claim as being directed to an abstract idea is appropriate. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of claim 1 of the '706 patent to claims found by the Federal Circuit to be abstract supports this conclusion. The Federal Circuit has held that claims reciting "a process of taking two data sets and combining them into a single data set" amount to the abstract idea of generating a data set "by taking existing information . . . and organizing this information into a new form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible."). Like the claim language in *Digitech*, claim 1 of the '706 patent recites a method of "taking two data sets and combining them into a single data set," without tying this process to a specific structure or machine. *Digitech*, 758 F.3d at 1350-51. Similarly, the Federal Circuit has routinely held that "claims reciting the collection, transfer, and publishing of data are directed to an abstract idea." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *In re TLI Commc'ns LLC Patent*

11

*Litig.*, 823 F.3d 607, 610-12 (Fed. Cir. 2016)). Thus, the method described in claim 1 of the '706 patent is consistent with claims found by the Federal Circuit to be abstract.

Claim 1 of the '706 patent does not recite a specific improvement to technology that would otherwise save it from abstraction. According to NICE, the novel data structure of a unified call record tracing event data from incompatible sources improves the way the computer stores and retrieves data in memory.[5] (D.I. 22 at 5) But the focus of the claim itself is not on the storage, retrieval, and memory capabilities of the computer. Instead, the claim is drawn to the idea of electronically receiving and combining data from two separate sources, which amounts to an abstract idea. *See Cellspin*, 927 F.3d at 1315 (citing *Elec. Power*, 830 F.3d at 1353; *TLI*, 823 F.3d at 610-12). During oral argument, NICE conceded that claim elements showing how to match the data from different sources are found in dependent claims and other independent claims, but did not indicate where such limitations were found in claim 1 of the '706 patent. (9/5/19 Tr. at 30:14-32:10)

Limiting the claim to the technological environment of "telephony events" does not render the claim any less abstract at step one.[6] *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018); *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (citing *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016)). In *Berkheimer*, the Federal Circuit determined that the claimed "parser," which transformed data from source to object code, did not render the claim any less abstract

---

[5] NICE concedes that CTI and SMDR links already existed, but claims this is irrelevant to the question of whether it was conventional to merge CTI and SMDR links to create a single call record for disparate audio records in the manner claimed. (D.I. 22 at 7) However, claim 1 of the '706 patent does not specify that the two claimed data sources are CTI and SDMR links. ('706 patent, col. 60:28-39) In fact, claim 1 of the '706 patent contains no language suggesting that data from the first and second data sources must be incompatible.

[6] The construction of "telephony events is discussed at § IV.B.1.b, *infra*.

absent evidence that the transformation improved computer functionality in some way. *Berkheimer*, 881 F.3d at 1367. Instead, the record showed that parsers had existed prior to the patent, and thus the claims were directed to the abstract idea itself. *Id.* Similarly, the focus of claim 1 of the '706 patent is on the abstract idea of combining data from two separate data sources into a single call record, and the claim does not identify any specific mechanisms for achieving this result. In other words, the claim is not "limited to rules with specific characteristics to create a technical effect," but instead is "written at a distinctly high level of generality." *Solutran*, 931 F.3d at 1167 (internal citations and quotation marks omitted).

### b. *Alice* step two

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (quoting *Alice*, 573 U.S. at 217). This analysis entails considering "whether the combination of elements was well-understood, routine, and conventional at the time of the invention."[7] *Exergen Corp. v. Kaz USA, Inc.*, 725 F. App'x 959, 963 (Fed. Cir. 2018). "[W]hether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

NICE contends that the amended complaint adequately alleges an inventive concept, complete with citations to relevant portions of the specification, which gives rise to a factual dispute regarding whether the combination of claim elements was conventional. (9/5/19 Tr. at 21:10-24:3) The amended complaint alleges that the prior art call recording technologies compiled separate call records from different data sources as independent records, resulting in

---

[7] The filing date of the application leading to the issuance of the '706 patent was June 8, 2001.

inefficient storage, search, and retrieval of call data. (D.I. 16 at ¶ 115) The operative pleading identifies "technical and unconventional solutions . . . via an efficient call data merging and archival methodology," including combining call data from synchronous and asynchronous sources, reducing memory usage, and offering a more flexible framework for controlling security access to the recording. (D.I. 16 at ¶ 116) These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to state a claim on a motion to dismiss. *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

The patent specification supports the allegations in the amended complaint. The '706 patent specification acknowledges the need for a system and method capable of gathering call information from multiple sources and combining the information into a single data model. ('706 patent, col. 3:1-5) The specification goes on to provide technical details regarding a method and system of merging call data originating from otherwise incompatible data sources. (*Id.*, cols. 5:3-19; 9:30-10:10; 29:12-23) As in *Berkheimer*, "[t]he specification describes an inventive feature that stores . . . data in a purportedly unconventional manner" to improve efficiency and reduce storage requirements. 881 F.3d at 1369. These alleged improvements are captured in claim 1's recitation of "electronically combining event data from said first source and event data from said second source into a single call record when event data from said first and second sources is related to the same telephone call." ('706 patent, col. 60:36-39) Because a factual dispute exists regarding whether the invention "describes well-understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '752 and '706 patents.

Although NICE raises a claim construction issue regarding the term "telephony events," the parties have agreed to the construction applied by Judge Farnan in a prior case for purposes

of the present motion: "Actions or occurrences detected by a computer program and that related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the calls)." *NICE Sys., Inc. et al. v. Witness Sys., Inc.*, C.A. No. 06-311-JJF, D.I. 279 at 15 (D. Del. Dec. 17, 2007). NICE relies on this definition in its brief for the position that telephony events constitute a specific means to achieve the creation of a single call record. (D.I. 22 at 4-5) At oral argument, counsel for CallMiner stated that, "[f]or purposes of this motion and for purposes of the section 101 analysis, we do not dispute or challenge the construction that's raised by NICE in its briefing." (9/5/19 Tr. at 9:19-10:20) As a result, there is no dispute relevant to the eligibility analysis regarding the proper construction of "telephony events" as used in claim 1 of the '706 patent. *See Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016).

NICE contends that other claim terms also require construction, and the court should deny the motion to dismiss on this basis. (9/5/19 Tr. at 20:3-21:3; 34:19-35:6) NICE relies on the Federal Circuit's recent decision in *MyMail, Ltd. v. ooVoo, LLC*, which concluded that the district court erred in failing to construe "toolbar" prior to reaching an eligibility determination. 934 F.3d 1373, 1380 (Fed. Cir. 2019). The law is well-established that "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). Nonetheless, "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Id.* at 1273-74; *see also Nat. Alts. Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1354 (Fed. Cir. 2019) (Reyna, J., concurring-in-part, dissenting-in-part) ("This case, and the general development of the law concerning § 101

15

analysis at the pleading stage, causes me to ask whether the time has come for this court to reconsider whether a Rule 12(c) motion based on § 101 should be decided before claim construction."). NICE has not presented specific arguments or proposed constructions for terms other than "telephony events" in connection with the present motion. However, in light of the court's recommendation that factual issues preclude dismissal of the '753 patent and the '706 patent under step two of the analysis, the court need not speculate as to whether claim construction would aid the analysis.

### 2.     The '370 and '946 patents

Claim 1 of the '370 patent recites:

A method for constructing and maintaining data representations of lifetimes of telephone calls comprising one or more segments, audio data for each segment being recorded on one or more recorders, the method comprising:

(a) constructing a call record for at least one telephone call;

(b) receiving data regarding telephony events associated with one or more telephone calls;

(c) matching a received telephony event with a constructed call record;

(d) updating the matching call record based on the received telephony event data; and

(e) combining the updated call record with data indicating the location of recorded audio data for the segment of the call, to obtain a master call record representing the lifetime of the telephone call.

('370 patent, col. 67:53-68:2) Claim 1 of the '946 patent adds the limitation that the received data comprises event data "describing the duration of the telephone call." ('946 patent, col. 71:10-28)

### a.     *Alice* step one

16

CallMiner contends that the '946 and '370 patents are directed to the abstract idea of creating a call record, collecting additional data regarding the call, and updating the call record with the collected data. (D.I. 19 at 6) CallMiner further alleges that prior art call monitoring systems were capable of monitoring, recording, saving, and organizing multiple audio input sources, and the claims themselves do not recite a solution to the problem of simultaneously monitoring both the SMDR link and the real-time CTI link. (*Id.* at 7) In response, NICE contends that the '370 and '946 patents recite technical improvements by claiming the construction of master call records to enable improved trace, recall, and viewing capabilities for distributed audio recordings. (D.I. 22 at 9)

Claim 1 of the '370 patent is drawn to the abstract idea of creating a call record, collecting additional data regarding the call, and updating the call record with the collected data. ('370 patent, cols. 67:53-68:2) This summation of the abstract idea closely tracks the claim language: "A method . . . comprising: (a) constructing a call record . . .; (b) receiving data regarding telephony events . . .; (c) matching a received telephony event with a constructed call record; (d) updating the matching call record based on the received telephony data; and (e) combining the updated call record with data . . . to obtain a master call record representing the lifetime of the telephone call." (*Id.*) Consistent with this articulation of the abstract idea, the specification provides that

> [t]he present invention is directed to a system and method that are capable of constructing a call record for each telephone call; receiving data regarding telephony events; matching a received telephony event with a call record; updating the matching call record based on the received telephony event data; and combining the updated call record with data indicating the location of recorded audio data for the segment of the call, to generate a master call record representing the lifetime of the telephone call.

17

('370 patent, col. 3:17-25)  Where, as here, the abstract idea accurately captures the focus of the claimed invention, it is appropriate to characterize the claim as being directed to an abstract idea. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of claim 1 of the '370 patent to claims found by the Federal Circuit to be abstract supports this conclusion.  The Federal Circuit has held that claims reciting "a process of taking two data sets and combining them into a single data set" amount to the abstract idea of generating a data set "by taking existing information . . . and organizing this information into a new form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.").  Like the claim language in *Digitech*, claim 1 of the '370 patent recites a method of "taking two data sets and combining them into a single data set," without tying this process to a specific structure or machine. *Digitech*, 758 F.3d at 1350-51.  Similarly, the Federal Circuit has routinely held that "claims reciting the collection, transfer, and publishing of data are directed to an abstract idea." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610-12 (Fed. Cir. 2016)).  Well-understood data-gathering activities like the ones described in claim 1 of the '370 patent "do[ ] not add any meaningful limitations to the abstract idea." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1364 (Fed. Cir. 2015).  Thus, the method described in claim 1 of the '370 patent is consistent with claims found by the Federal Circuit to be abstract.

Nor does claim 1 of the '370 patent recite a specific improvement to technology or language confining the claim to a particular solution to an identified problem. *See IPA Techs.,*

18

*Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 364 (D. Del. 2018) (concluding that claims merely "describ[ing] a desired function or outcome, without providing any limiting detail that confine[s] the claim to a particular solution to an identified problem," were abstract). According to NICE, the novel data structure of the master call record improves the computer's trace, recall, and viewing capabilities for distributed audio recordings. (D.I. 22 at 9) But the focus of the claim itself is not on the data structure of the master call record. Instead, the claim is drawn to the idea of creating a call record, collecting additional data regarding the call, and updating the call record with the collected data, which amounts to an abstract idea. *See Cellspin*, 927 F.3d at 1315 (citing *Elec. Power*, 830 F.3d at 1353; *TLI*, 823 F.3d at 610-12). During oral argument, NICE conceded that claim elements showing how to assemble and play back segments of the telephone calls using the recorder locations described in the master call record are found in dependent claim 8, but NICE did not indicate where such direction was provided in claim 1 of the '370 patent. (9/5/19 Tr. at 33:7-14) Moreover, for the reasons previously stated at § IV.B.1.a, *supra*, limiting the claim to the technological environment of "telephony events" does not render the claim any less abstract at step one. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (internal citations and quotation marks omitted); *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (citing *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016)).

### b.    *Alice* **step two**

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin*, 927 F.3d at 1316 (quoting *Alice*, 573 U.S.

19

at 217). CallMiner contends that the claim limitations of the '370 patent[8] are directed to the use of routine computer functionalities to increase the speed of collecting and combining data related to telephone calls, which does not amount to an inventive concept. (D.I. 19 at 7-8) In response, NICE contends that the amended complaint adequately alleges an inventive concept, complete with citations to relevant portions of the specification, which gives rise to a factual dispute regarding whether the combination of claim elements was conventional. (9/5/19 Tr. at 21:10-24:3) Furthermore, NICE argues that a master call record is a novel data structure which solves the problem of "fruitless searching." (D.I. 22 at 10)

According to the allegations in the operative pleading, the prior art call recording technologies compiled separate call records from different data sources as independent records, resulting in inefficient storage, search, and retrieval of call data. (D.I. 16 at ¶ 127) The amended complaint identifies a "technical and unconventional solution . . . via an efficient call data merging and archival methodology," including combining call data from synchronous and asynchronous sources, reducing memory usage, and offering a more flexible framework for controlling security access to the recording. (*Id.* at ¶ 128) These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to state a claim on a motion to dismiss. *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

The patent specification supports the allegations in the amended complaint. The '370 patent specification acknowledges the need for a system and method capable of gathering call information from multiple sources and combining the information into a single data model. ('370 patent, col. 3:2-14) The specification goes on to provide technical details regarding a method and system of merging call data originating from otherwise incompatible data sources.

___

[8] The application leading to the issuance of the '370 patent was filed on June 8, 2001.

(*Id.*, cols. 4:25-41; 8:58-9:38; 31:7-18)  As in *Berkheimer*, "[t]he specification describes an inventive feature that stores . . . data in a purportedly unconventional manner" to improve efficiency and reduce storage requirements.  881 F.3d at 1369.  These alleged improvements are captured in claim 1's recitation of "combining the updated call record with data indicating the location of recorded audio data for the segment of the call, to obtain a master call record representing the lifetime of the telephone call."  ('370 patent, cols. 67:66-68:2)  Because a factual dispute exists regarding whether the invention "describes well-understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '370 and '946 patents.

### C. Call Classification Patents

#### 1. The '523 patent

Claim 1 of the '523 patent recites:

A system for analyzing a telephonic communication between one or more customers and a contact center having one or more agents, the system comprising:

a first server for recording a telephonic communication between a customer and an agent;

a module for processing said telephonic communication into a plurality of computer telephony interpretation events; and

a module for analyzing said plurality of computer telephony interpretation events and classifying said plurality of computer telephony interpretation events into a first type and a second, different type.

('523 patent, col. 19:48-59)

##### a.     *Alice* step one

According to CallMiner, the '523 patent is directed to the abstract idea of collecting and classifying data from a customer-salesperson interaction. (D.I. 19 at 9)  CallMiner explains that the claims of the '523 patent recite a system for analyzing a telephone call using the generic computer components of a server and two modules to record and process the call, and analyze and classify the events. (*Id.*)  CallMiner alleges that the additional recitation of "data manipulation steps," without more, is an abstract idea. (*Id.*)  In response, NICE contends that the '523 patent provides eligible improvements to the field of call center data monitoring by reciting how to categorize telephone conversations and segment audio. (D.I. 22 at 11-12)

Claim 1 of the '523 patent is drawn to the abstract idea of collecting and classifying data from a customer-salesperson interaction. ('523 patent, col. 19:48-59)  This summation of the abstract idea closely tracks the claim language: "A system for analyzing a telephonic communication between . . . customers and . . . a contact center . . . the system comprising: a first server for recording a telephonic communication . . .; a module for processing said telephonic communication . . .; and a module for analyzing . . . and classifying" the telephony events. (*Id.*)  Consistent with this articulation of the abstract idea, the specification provides that

> [t]he invention relates to . . . a system for . . . analyzing a telephone
> communication between a customer and a contact center to determine
> communication objects, forming segments of like communication objects,
> determining the strength of negotiations between the contact center and the
> customer from the segments, and automate setup time calculation.

('523 patent, col. 1:18-24)  Where, as here, the abstract idea accurately captures the focus of the claimed invention, it is appropriate to characterize the claim as being directed to an abstract idea. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of the data manipulation steps recited in claim 1 of the '523 patent to claims found abstract by the Federal Circuit supports this conclusion. The Federal Circuit has held that claims directed to collecting, displaying, and manipulating data are abstract. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)). Like the claim language at issue in *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, claim 1 of the '523 patent recites the elements of the system using result-based functional language. The steps of analyzing, recording, processing, and classifying using generic computer components as recited in claim 1 of the '523 patent are comparable to the claimed functional results of "converting," "routing," "controlling," "monitoring," and "accumulating records" in *Two-Way Media*, which lacked a description of how to achieve the results in a non-abstract way. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). Thus, the system described in claim 1 of the '523 patent is consistent with claims found by the Federal Circuit to be abstract.

Nor does claim 1 of the '523 patent recite a specific improvement to technology or language confining the claim to a particular solution to an identified problem. *See IPA Techs., Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 364 (D. Del. 2018) (concluding that claims merely "describ[ing] a desired function or outcome, without providing any limiting detail that confine[s] the claim to a particular solution to an identified problem," were abstract). According to NICE, the claim articulates improvements to the field of call center data monitoring by separating call recordings into constituent voice data between speakers and converting them to text data. (D.I. 22 at 11) But claim 1 of the '523 patent does not include limitations describing the separation of call recordings into constituent voice data or the conversion of the voice data

23

into text data. Instead, the claim is drawn to the functional steps of analyzing, recording, processing, and classifying telephonic communications using standard computer components. Using generic computer components to carry out a claimed abstract idea is not sufficient to render a claim patent eligible. *See Two-Way Media*, 874 F.3d at 1338 (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

### b. *Alice* step two

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin*, 927 F.3d at 1316 (quoting *Alice*, 573 U.S. at 217). CallMiner contends that the claim limitations of the '523 patent[9] are directed to the use of generic computer components, such as a server, module, and processor, to collect and classify data. (D.I. 19 at 13) In response, NICE contends that the claims recite the inventive concept of objectively determining segments of audio from like objects for analysis, as distinguished from the subjective determinations used in prior art methods. (D.I. 22 at 12-13)

According to the allegations in the operative pleading, prior art data monitoring and recording systems often relied on third-party call centers to monitor and assess the quality of call agents, which was inconsistent and subjective. (D.I. 16 at ¶ 163) Speech analytics software did not adequately overcome issues with inefficient classification schemes and call segmentation. (*Id.*) The amended complaint identifies a "technical and unconventional solution . . . by providing a system that processes a telephonic communication by breaking down an interaction into objects and categories," including partitioning the communication into two data sets, translating the data sets into text, and classifying the data sets for analysis. (*Id.* at ¶ 164) These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient"

---

[9] The application leading to the issuance of the '523 patent was filed on September 29, 2008.

to state a claim on a motion to dismiss. *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

The patent specification supports the allegations in the amended complaint. The '523 patent specification describes separating call recordings into constituent voice data between speakers and converting them to text data ('523 patent, col. 2:41-46), analyzing the data for objects based on spoken words (*id.*, col. 16:10-27), classifying the objects by analyzing adjacent objects for perspective (*id.*, col. 17:1-22), and compiling segments of the recorded communication for subsequent review (*id.*, col. 16:28-32). In this manner, the specification of the '523 patent describes a system for objectively analyzing audio segments based on objects formed from voice data and classified into types, when prior systems relied on subjective determinations. ('523 patent, cols. 1:50-62, 16:28-32, 18:38-41) The concept of establishing a series of steps to objectively analyze a telephone call may be inventive where, as here, the claimed steps replace a prior subjective process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) ("Defendants concede an animator's [prior art] process was driven by subjective determinations rather than specific, limited mathematical rules" of the claimed invention). These alleged improvements are captured in claim 1's recitation of "analyzing a telephonic communication between one or more customers and a contact center having one or more agents . . . processing said telephonic communication into a plurality of computer telephony interpretation events; and classifying said plurality of computer telephony interpretation events into a first type and a second, different type." ('523 patent, col. 19:48-59) Because a factual dispute exists regarding whether the invention "describes well-understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '523 patent.

During oral argument, NICE also identified specific claim construction disputes that would bear on the patentability analysis. (9/5/19 Tr. at 60:23-61:9) Specifically, NICE identified the term "module" as a claim term requiring construction. (*Id.*) Although "claim construction is not an inviolable prerequisite to a validity determination under § 101," the Federal Circuit recognizes that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012). NICE has not presented specific arguments or proposed constructions for the term "module" as used in the '523 patent in this case. However, in light of the court's recommendation that factual issues preclude dismissal of the '523 patent at step two, the court need not speculate as to whether claim construction would aid the analysis.

### 2. The '639 patent

Claim 1 of the '639 patent recites:

A non-transitory computer program for determining the complexity of a telephonic communication received by a contact center, the computer program being embodied on a computer readable storage medium adapted to control a computer and comprising:

> a code segment for receiving an input transmission of a predetermined call rule;
>
> a code segment for receiving a telephonic communication;
>
> a code segment for determining call attributes associated with the telephonic communication;
>
> a code segment for comparing the call rule to the call attributes of the telephonic communication; and

a code segment for generating output data indicative of the complexity of the
    telephonic communication and, a code segment for generating a graphical
    user interface for viewing the telephonic communication on display, the
    graphical user interface being configured to display a time-based being
    representation of the telephonic communication, the time-based
    representation including graphical representation of the call attributes
    associated with the telephonic communication; wherein the time-based
    representation of the telephonic communication includes a graphical
    representation of the progress of the audio file being played.

('639 patent, col. 16:42-65)

### a. *Alice* step one

According to CallMiner, the '639 patent is directed to the abstract idea of collecting and

classifying data from a customer-salesperson interaction. (D.I. 19 at 9) CallMiner contends that

the specification of the '639 patent recites generic hardware, software, and operating system

combinations which perform the claimed functions as they would otherwise be performed by a

customer service representative manually determining the duration of the call, comparing the

duration to a pre-set threshold, and classifying the call based on certain criteria. (*Id.* at 11-12)

In response, NICE contends that the claims of the '639 patent recite improvements by

determining the complexity of a call using determined "call attributes" and analyzing behavioral

measures like distress, tone, and silence, and subsequently generating graphical interfaces

displaying time-based representations of the call attributes. (D.I. 22 at 13-14) According to

NICE, these innovations provide technical advantages for objectively handling complex calls,

eliminating subjective bias by using call rules with defined thresholds. (*Id.* at 14) NICE

emphasizes that processing calls based on specific rules involving detected stress events was

unconventional at the time of the invention. (*Id.* at 15)

Claim 1 of the '639 patent is drawn to the abstract idea of collecting and classifying data

from a customer-salesperson interaction. ('639 patent, col. 16:42-65) This summary of the

abstract idea closely tracks the claim language: "A non-transitory computer program for determining the complexity of a telephonic communication received by a contact center" comprising code segments for "receiving" an input transmission and a telephonic communication, a code segment for "determining call attributes," a code segment for "comparing the call rule to the call attributes," and a code segment for "generating" data regarding the complexity of the call and "a graphical user interface for viewing the telephonic communication on display. . . ." (*Id.*) Consistent with this articulation of the abstract idea, the specification provides for

> a method of determining the complexity of a telephonic communication received by a contact center . . . . A recorded telephonic communication is received and call attributes associated with the telephonic communication are determined. . . . The established call rule is compared to the call attributes of the telephonic communication, and data indicative of the complexity of the telephonic communication is generated.

('639 patent, col. 2:7-21) Where, as here, the abstract idea accurately captures the focus of the claimed invention, it is appropriate to characterize the claim as being directed to an abstract idea. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of the steps recited in claim 1 of the '639 patent to claims found abstract by the Federal Circuit supports this conclusion. The Federal Circuit has held that claims directed to systems and methods of receiving, screening, and distributing email are abstract because screening communications based on certain identifiers is a well-known, fundamental practice. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316-18 (Fed. Cir. 2016) (concluding that claims were abstract because they were "directed to human-practicable concepts, which could be implemented in, for example, a brick-and-mortar post office."). Like claim 1 of the '639 patent, the claim language at issue in *Symantec* recites a receipt mechanism

for the email messages, a database of business rules used to control delivery of the email messages, a rule engine to couple the received email message with the applicable business rules, and a distribution mechanism to apply at least one action from the rule engine to control delivery of the email messages. *Id.* at 1316-17. Comparable elements are set forth in claim 1 of the '639 patent, applied in the context of telephonic communications instead of email messages. *Id.* Moreover, the patent specification acknowledges that "[i]t is known to utilize telephone call centers to facilitate the receipt, response and routing of incoming telephone calls relating to customer service, retention, and sales. It is also known to use a web based system to facilitate requests and inquiries related to customer service." ('639 patent, col. 1:23-27) Thus, the system described in claim 1 of the '639 patent is consistent with claims found by the Federal Circuit to be abstract.

In addition, claim 1 of the '639 patent does not recite a specific improvement to technology. ('639 patent, col. 13:50-58) ("It will be understood by those of skill that the translation of audio to text and subsequent data mining may be accomplished by systems known in the art."). According to NICE, the claim articulates improvements to the field of call center data monitoring by providing a means to objectively analyze complex calls on a large scale and manage the future handling of similar calls. (D.I. 22 at 14) NICE focuses in particular on the claimed call rules with defined thresholds. (*Id.*; 9/5/19 Tr. at 56:1-9) But claim 1 of the '639 patent does not include limitations describing the call rules, which are only found in the subsequent claims. Instead, claim 1 is drawn to the functional steps of receiving, comparing, and generating data in the context of telephonic communications, using only standard computer components. Using generic computer components to carry out a claimed abstract idea is not sufficient to render a claim patent eligible. *See Two-Way Media*, 874 F.3d at 1338 (citing *In re*

29

*TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)). In *Finjan, Inc. v. Blue Coat Systems, Inc.*, the Federal Circuit upheld the patent eligibility of claims directed to a behavior-based virus scanning method that "employ[ed] a new kind of file that enables a computer security system to do things it could not do before," such as accumulating and utilizing behavior-based information about potential threats. 879 F.3d 1299, 1304 (Fed. Cir. 2018). Claim 1 of the '639 patent does not recite a limitation comparable to the new file type in *Finjan*.

### b. *Alice* step two

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin*, 927 F.3d at 1316 (quoting *Alice*, 573 U.S. at 217). CallMiner contends that the claim limitations of the '639 patent[10] describe only generic computer component and conventional software instructions, with no description of how call attributes or call "complexity" are determined. (D.I. 19 at 13-14) In response, NICE contends that the claims recite the inventive concept of objectively analyzing complex calls on a large scale and managing the future handling of similar calls, as distinguished from the subjective determinations used in prior art methods. (D.I. 22 at 14)

According to the allegations in the operative pleading, prior art call centers were incapable of routing calls based on their complexity in an automated manner, instead utilizing self-service interactive voice response ("IVR") systems or live customer service representatives. (D.I. 16 at ¶ 175) Existing systems could not determine the complexity of a communication between a customer and an organization to properly route the call or take other actions in real-time. (*Id.*) The amended complaint identifies an "unconventional, technical solution . . . by providing a system for generating call attributes associated with a customer interaction and

---

[10] The application leading to the issuance of the '639 patent was filed on March 28, 2008.

comparing those attributes to a rule to determine the complexity of the interaction in real-time," including call duration or detected distress events. (*Id.* at ¶ 176) These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to state a claim on a motion to dismiss. *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

The patent specification supports the allegations in the amended complaint. The '639 patent specification describes receiving a recorded call and determining call attributes associated with the call ('639 patent, col. 2:13-15), and comparing a call rule to the call attributes and generating data regarding the complexity of the call based on that comparison (*id.*, col. 2:18-21). In this manner, the specification of the '639 patent describes a system for objectively analyzing the call attributes by applying specific call rules based on those attributes, when prior systems relied on subjective determinations. ('639 patent, cols. 1:23-63, 2:7-41) The concept of establishing a series of steps to objectively analyze a telephone call may be inventive where, as here, the claimed steps replace a prior subjective process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) ("Defendants concede an animator's [prior art] process was driven by subjective determinations rather than specific, limited mathematical rules" of the claimed invention). These alleged improvements are captured in claim 1's recitation of "determining the complexity of a telephonic communication received by a contact center" comprising code segments for receiving a predetermined call rule and a telephonic communication, "determining call attributes associated with the telephonic communication," "comparing the call rule to the call attributes," and generating data showing the complexity of the call and a graphical user interface to display the call data. ('639 patent, col. 16:42-65) Because a factual dispute exists regarding whether the invention "describes well-

31

understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '639 patent.

### D.    Call Evaluation Patents

#### 1.    The '872 patent

Claim 1 of the '872 patent recites:

A computer-implemented method for performing a quality evaluation, the method comprising:

> accepting a definition of a quality task associated with a predefined evaluation form, wherein the definition of the quality task is based on quality task parameters selected by a user on a graphical user interface;

> activating the quality task upon detecting breaching of a predefined key performance indicator (KPI);

> selecting from a plurality of interaction recordings one or more selected interaction recordings for evaluations, the one or more interactions recordings selected with relation to said quality task;

> associating the selected interaction recordings with the predefined evaluation form;

> displaying a graphical representation of the one or more interaction recordings and the evaluation form, wherein the evaluation form is used to evaluate the one or more interaction recordings;

> receiving evaluation results of the one or more selected interaction recordings; and

> performing at least one predefined action based on the results.

('872 patent, col. 14:37-58)

### a. *Alice* step one

CallMiner contends that the '872 patent is directed to the abstract idea of evaluating customer-salesperson interactions, which is a well-known business process that can be performed manually by humans. (D.I. 19 at 14-15; 9/5/19 Tr. at 64:11-20) According to CallMiner, the claimed method involves the routine data manipulation functions of "retrieving, analyzing, quantitatively rating, and automatically pushing" data, each of which is a patent-ineligible abstract idea under Federal Circuit precedent. (D.I. 19 at 15) CallMiner alleges that the claimed functions are implemented with generic computing components performing routine functions, and the claimed key performance indicator triggering the evaluation can be nearly any parameter. (*Id.* at 16-17)

In response, NICE contends that the claims of the '872 patent recite a patent-eligible process for automatically screening calls for evaluation when the calls satisfy certain quality metrics, eliminating subjective approaches to call review. (D.I. 22 at 16) According to NICE, the automatic selection of appropriate recordings and presentment of specific interfaces upon a triggering event represents an improvement to the functionality of a computer. (*Id.*)

Claim 1 of the '872 patent is drawn to the abstract idea of evaluating customer-salesperson interactions. ('872 patent, col. 14:37-58) This articulation of the abstract idea is consistent with the claim language: "A computer-implemented method for performing a quality evaluation" comprising (1) "accepting a definition of a quality task associated with a predefined evaluation form," (2) "activating the quality task upon detecting breaching of a predefined key performance indicator (KPI)," (3) selecting an "interaction recording[ ] for evaluations," (4) "associating the . . . interaction recording[ ] with the predefined evaluation form," (5) "displaying a graphical representation of the . . . interaction recording[ ] and the evaluation form," (6)

"receiving evaluation results," and (7) "performing at least one predefined action based on the results." (*Id.*) Consistent with this articulation of the abstract idea, the specification provides for a computer-implemented method of selecting a call recording for evaluation, assessing the call recording with a predefined key performance indicator, presenting the evaluation to an evaluator, and performing a predefined action based on the results of the evaluation. ('872 patent, Abstract) Where, as here, the abstract idea accurately captures the focus of the claimed invention, it is appropriate to characterize the claim as being directed to an abstract idea. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of the data manipulation steps recited in claim 1 of the '872 patent to claims found abstract by the Federal Circuit supports this conclusion. The Federal Circuit has held that claims directed to collecting, displaying, and manipulating data are abstract. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)). Like the claim language at issue in *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, claim 1 of the '872 patent recites the elements of the system using result-based functional language. The steps of activating, selecting, associating, displaying, receiving, and performing tasks using generic computer components as recited in claim 1 of the '872 patent are comparable to the claimed functional results of "converting," "routing," "controlling," "monitoring," and "accumulating records" in *Two-Way Media*, which lacked a description of how to achieve the results in a non-abstract way. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). Thus, the system described in claim 1 of the '872 patent is consistent with claims found by the Federal Circuit to be abstract.

34

Nor does claim 1 of the '872 patent recite a specific improvement to technology or language confining the claim to a particular solution to an identified problem. *See IPA Techs., Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 364 (D. Del. 2018) (concluding that claims merely "describ[ing] a desired function or outcome, without providing any limiting detail that confine[s] the claim to a particular solution to an identified problem," were abstract). According to NICE, the claim overcomes "the prohibitive complexity of retrieving, analyzing, quantitatively rating, and automatically pushing critical call data in an extensive universe of raw data." (D.I. 22 at 16) But this description of the alleged improvement to technology reinforces the fact that claim 1 of the '872 patent is drawn to purely functional steps. *See Two-Way Media*, 874 F.3d at 1338 (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)). Moreover, the specification of the '872 patent acknowledges that evaluating a call based on various parameters and key performance indicators were known in the art ('872 patent, cols. 3:38-44, 4:52-57), using metadata to search for information objects about the call was known in the art (*id.*, cols. 3:67-4:6), and the claimed invention still requires the evaluation itself to be performed by call managers (*id.*, col. 3:44-46).

### b. *Alice* step two

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin*, 927 F.3d at 1316 (quoting *Alice*, 573 U.S. at 217). CallMiner argues that the '872 patent[11] does not recite an inventive concept, as the specification of the '872 patent acknowledges that receiving user input and retrieving and analyzing data are routine functions performed by generic computing components. (D.I. 19 at

---

[11] The application leading to the issuance of the '872 patent was filed on July 8, 2009.

19-20) In response, NICE contends that the claims recite an unconventional solution for screening calls for evaluation in a call center environment. (D.I. 22 at 16)

According to the allegations in the operative pleading, prior art call center management systems were not capable of screening multiple calls in real time for evaluation in a quantitative and automated way. (D.I. 16 at ¶ 91) Evaluation by random selection was ineffective and time-consuming, and the randomly selected calls were not always representative of performance issues. (*Id.*) The amended complaint identifies a "technological and unconventional solution . . . by applying a speech analytics engine to audio data and automatically selecting, classifying, and presenting calls for evaluation based on an array of quantitative metrics." (*Id.* at ¶ 92) These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to state a claim on a motion to dismiss. *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

The patent specification supports the allegations in the amended complaint. The '872 patent specification describes a method to eliminate the need for random selection in call evaluations, which was ineffective because quality managers could not select calls based on a specific agent a specific time period. ('872 patent, cols. 1:30-39; 3:10-14) The '872 patent solves this problem by "providing the quality manager with the selected recordings" in a "push" mode of operation after applying specific parameters. (*Id.*, col. 3:32-46) In this manner, the specification of the '872 patent describes a system for objectively selecting calls for quality review based on predefined parameters, when prior systems relied on subjective determinations. ('872 patent, col. 3:3-46) The concept of establishing a series of steps to objectively analyze a telephone call may be inventive where, as here, the claimed steps replace a prior subjective process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir.

2016) ("Defendants concede an animator's [prior art] process was driven by subjective determinations rather than specific, limited mathematical rules" of the claimed invention). These alleged improvements are captured in claim 1's recitation of applying quality task parameters after a breach of key performance indicators is detected and displaying the results of the automated evaluation form to a reviewer. ('872 patent, col. 14:37-58) Because a factual dispute exists regarding whether the invention "describes well-understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '872 patent.

### 2.    The '248 patent

Claim 1 of the '248 patent recites:

A non-transitory, computer readable medium having an executable computer readable program code embedded therein, the executable computer readable program code for implementing a method of analyzing caller interaction events, which method comprises:

> receiving a caller interaction event between an agent and a caller;

> extracting caller event data from the caller interaction event;

> generating a report displaying one or more selected categories of the caller event data; and

> determining customer satisfaction following the caller interaction event based on the one or more selected categories of the caller event data.

('248 patent, col. 28:41-54)

### a.    *Alice* step one

CallMiner contends that the '248 patent is directed to the abstract idea of evaluating customer-salesperson interactions, reciting routine data manipulation functions that are not patent eligible. (D.I. 19 at 17) According to CallMiner, the '248 patent claims the business

practice of a salesperson identifying the perceived satisfaction of a customer based on certain characteristics of a call, despite the fact that humans have performed this type of evaluation for years. (*Id.* at 17-18)

In response, NICE contends that the '248 patent describes customer satisfaction evaluated objectively based on certain characteristics of a call, such as the duration of the call and the hold time during the call, instead of basing the analysis on the subjective human perception of customer satisfaction in general. (D.I. 22 at 17) NICE argues that the claims apply both linguistic and non-linguistic indicators in a rules-based approach to determining caller satisfaction by way of objective computer analysis. (*Id.* at 17-18)

Claim 1 of the '248 patent is drawn to the abstract idea of evaluating customer-salesperson interactions. ('248 patent, col. 28:41-54) This articulation of the abstract idea is consistent with the claim language: "A non-transitory, computer readable medium . . . for implementing a method of analyzing caller interaction events" comprising (1) "receiving a caller interaction event," (2) "extracting caller event data from the caller interaction event," (3) "generating a report displaying" the caller event data, and (4) "determining customer satisfaction" based on the caller event data. (*Id.*) Consistent with this articulation of the abstract idea, the specification provides for a computer-implemented method of routing a customer call to a call agent, recording voice data, analyzing the voice data, generating an assessment of the call, and providing the assessment to a supervisor or trainer to evaluate the call agent. ('872 patent, col. 24:6-25) Where, as here, the abstract idea accurately captures the focus of the claimed invention, it is appropriate to characterize the claim as being directed to an abstract idea. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of the data manipulation steps recited in claim 1 of the '248 patent to claims found abstract by the Federal Circuit supports this conclusion. The Federal Circuit has held that claims directed to collecting, displaying, and manipulating data are abstract. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)). Like the claim language at issue in *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, claim 1 of the '248 patent recites the elements of the system using result-based functional language. The steps of receiving, extracting, generating, and determining using generic computer components as recited in claim 1 of the '248 patent are comparable to the claimed functional results of "converting," "routing," "controlling," "monitoring," and "accumulating records" in *Two-Way Media*, which lacked a description of how to achieve the results in a non-abstract way. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). Thus, the system described in claim 1 of the '248 patent is consistent with claims found by the Federal Circuit to be abstract.

Nor does claim 1 of the '248 patent recite a specific improvement to technology or language confining the claim to a particular solution to an identified problem. *See IPA Techs., Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 364 (D. Del. 2018) (concluding that claims merely "describ[ing] a desired function or outcome, without providing any limiting detail that confine[s] the claim to a particular solution to an identified problem," were abstract). According to NICE, the claim applies an objective, rules-based approach to determining caller satisfaction based on caller event data. (D.I. 22 at 17) But this description of the alleged improvement to technology reinforces the fact that claim 1 of the '248 patent is drawn to functional steps. *See Two-Way Media*, 874 F.3d at 1338 (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607,

611 (Fed. Cir. 2016)). Moreover, the specification of the '248 patent acknowledges that it was known to use call centers to process customer service calls ('248 patent, col. 1:33-41), it was known to monitor calls between a customer and a call agent (*id.*, col. 1:42-45), it was known that psychological behavioral models could be used as tools to evaluate and understand interactions among people (*id.*, cols. 2:48-3:5), and devices and software for recording and logging calls to a call center and converting audio signals to text files were well-known (*id.*, col. 3:6-11).

### b.    *Alice* step two

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin*, 927 F.3d at 1316 (quoting *Alice*, 573 U.S. at 217). CallMiner argues that the '248 patent[12] does not include an inventive concept, instead reciting a generic "computer readable code embedded" on a "computer readable medium" for analyzing "caller event data." (D.I. 19 at 20)  In response, NICE contends that the claims recite an unconventional monitoring process automatically subjecting call data to behavioral models for categorizing behaviors. (D.I. 22 at 18)

According to the allegations in the operative pleading, prior art call center management systems could not determine a customer's satisfaction level or the quality of an agent in an objective manner. (D.I. 16 at ¶ 151)  Gathering data from post-call surveys was inefficient and failed to provide additional insight. (*Id.*)  The amended complaint identifies a "technical and unconventional solution . . . by automatically subjecting call data to a behavioral model for deducing and categorizing human behaviors." (*Id.* at ¶ 152)  These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to state a claim on a motion to dismiss. *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

---

[12] The application leading to the issuance of the '248 patent was filed on February 13, 2017.

The patent specification supports the allegations in the amended complaint. The '248 patent specification describes a "need for a system that analyzes the underlying behavioral characteristics of a customer and agent so that data relating to these behavioral characteristics can be used for subsequent analysis and training." ('248 patent, col. 2:32-36) The '248 patent solves this problem by using a computer program to objectively identify behavioral signifiers based on linguistic patterns and non-linguistic indicators. (*Id.*, cols. 21:53-22:3) The concept of establishing a series of steps to objectively analyze a telephone call may be inventive where, as here, the claimed steps replace a prior subjective process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) ("Defendants concede an animator's [prior art] process was driven by subjective determinations rather than specific, limited mathematical rules" of the claimed invention). These alleged improvements are captured in claim 1's recitation of capturing and processing call data to determine customer satisfaction. ('248 patent, col. 28:41-54) Because a factual dispute exists regarding whether the invention "describes well-understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '248 patent.

### 3. The '400 patent

Claim 1 of the '400 patent recites:

A customer analysis method for analyzing electronic customer communication data and generating behavioral assessment data, which method comprises:

> receiving a plurality of types of electronic customer communication data by one or more servers configured to provide a user interface comprising a web site, web portal, or virtual portal or application, wherein at least one of the types of electronic customer communication data includes voice data, and at least one of social media data, update status, media feed, social media review, social media data stream, social media profile or social media account setup;

41

generating a text file from the voice data;

identifying a customer associated with the electronic customer communication data received by the one or more servers;

generating behavioral assessment data by analyzing the text file and the at least one of social media data, update status, media feed, social media review, social media data stream, social media profile or social media account setup for that identified customer; and

displaying instructions to a user via a reporting engine, wherein the instructions are based on the generated behavioral assessment data,

wherein the user includes the identified customer or a customer service agent.

('400 patent, col. 32:18-43)

### a.    *Alice* step one

CallMiner alleges that the claims of the '400 patent are directed to the abstract idea of evaluating customer-salesperson interactions. (D.I. 19 at 18-19)  According to CallMiner, the '400 patent automates the human activity of assessing a person's behavior by analyzing phone calls and social media posts using generic computer components. (*Id.* at 19)  In response, NICE contends that the '400 patent recites an application of analyzing electronic communications based on data mined from social media feeds, web data, or chat feeds and analyzing the data along with text-translated voice data to generate a behavioral assessment of customers. (D.I. 22 at 19)  By making use of behavior-based information to achieve specific results, NICE contends that the claims of the '400 patent are patent-eligible. (*Id.*)

Claim 1 of the '400 patent is drawn to the abstract idea of evaluating customer-salesperson interactions. ('400 patent, col. 32:18-43)  This articulation of the abstract idea is consistent with the claim language: "A customer analysis method for analyzing electronic customer communication data and generating behavioral assessment data" comprising the steps

of (1) receiving electronic customer communication data, (2) generating a text file from collected voice data, (3) identifying a customer associated with the communication, (4) generating behavioral assessment data based on the text file and social media data, and (5) displaying instructions to the user based on the behavioral assessment data. (*Id.*) Consistent with this articulation of the abstract idea, the specification provides for a computer-implemented method of analyzing electronic data transmissions by customers in addition to voice data. ('400 patent, col. 2:4-12) Where, as here, the abstract idea accurately captures the focus of the claimed invention, it is appropriate to characterize the claim as being directed to an abstract idea. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

A comparison of the data manipulation steps recited in claim 1 of the '400 patent to claims found abstract by the Federal Circuit supports this conclusion. The Federal Circuit has held that claims directed to collecting, displaying, and manipulating data are abstract. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)). Like the claim language at issue in *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, claim 1 of the '400 patent recites the elements of the system using result-based functional language. The steps of receiving, generating, identifying, and displaying using generic computer components as recited in claim 1 of the '400 patent are comparable to the claimed functional results of "converting," "routing," "controlling," "monitoring," and "accumulating records" in *Two-Way Media*, which lacked a description of how to achieve the results in a non-abstract way. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). Thus, the system described in claim 1 of the '400 patent is consistent with claims found by the Federal Circuit to be abstract.

Nor does claim 1 of the '400 patent recite a specific improvement to technology or language confining the claim to a particular solution to an identified problem. *See IPA Techs., Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 364 (D. Del. 2018) (concluding that claims merely "describ[ing] a desired function or outcome, without providing any limiting detail that confine[s] the claim to a particular solution to an identified problem," were abstract); *see also iSentium, LLC v. Bloomberg Fin. L.P.*, 343 F. Supp. 3d 379, 393 (S.D.N.Y. 2018) (concluding that purported improvements to existing methods for interpreting posts on social media did not amount to an improvement to the functionality of a computer). According to NICE, the claim provides a means of mining data from unconventional sources, including social media feeds, web data, or chat feed data, and analyzing it in conjunction with voice data to generate a behavior assessment of a customer. (D.I. 22 at 19) But this description of the alleged improvement to technology reinforces the fact that claim 1 of the '400 patent is drawn to functional steps. *See Two-Way Media*, 874 F.3d at 1338 (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)). Moreover, the specification of the '400 patent acknowledges that it was known to monitor calls and other electronic communications between a customer and a call center ('400 patent, col. 1:38-39), it was known that psychological behavioral models could be used as tools to evaluate and understand interactions among people (*id.*, cols. 19:7-12), the computer hardware and programming techniques were known (*id.*, cols. 26:18-20, 28:1-7), and techniques were known for interpreting non-linguistic event data (*id.*, col. 28:53-55).

### b.    *Alice* step two

The court next considers whether "the claimed elements—'individually and as an ordered combination'—recite an inventive concept." *Cellspin*, 927 F.3d at 1316 (quoting *Alice*, 573 U.S.

at 217).  CallMiner argues that the '400 patent[13] does not recite an inventive concept at step two of the analysis because the claims recite only generic computer components performing well-known techniques for evaluating data.  (D.I. 19 at 20)  NICE contends that the '400 patent recites the inventive concept of mining specific types of data from specific channels to make specific types of assessments to achieve specific results.  (D.I. 22 at 20)

According to the allegations in the operative pleading, prior art call center management systems relied on third-party call centers to monitor the quality of call center agents, which was inconsistent and subjective.  (D.I. 16 at ¶ 199)  Moreover, existing speech analytics software did not mine data from social media feeds, web data, or chat feed data.  (*Id.*)  The amended complaint identifies an "unconventional, technical solution . . . by providing a system for generating behavioral assessment data from electronic customer communications."  (*Id.* at ¶ 200)  These "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to state a claim on a motion to dismiss.  *See Cellspin*, 927 F.3d at 1317 (citing *Aatrix*, 882 F.3d at 1128).

The patent specification supports the allegations in the amended complaint.  The '400 patent specification describes the generation of behavioral assessment data by analyzing electronic customer communication data.  ('400 patent, col. 12:12-25)  The '400 patent provides

> a method for analyzing electronic customer communication data, generating
> behavioral assessment data and generating a responsive communication, that
> includes receiving, by a server, electronic customer communication data of two or
> more types, wherein the server is configured to provide a user interface . . . and
> wherein . . . electronic customer communication data includes social media data,
> update status, media feed, social media review, social media data stream, social
> media profile or social media account setup, determining customer identification
> data associated with the electronic customer communication data by the server,
> analyzing the electronic customer communication data by applying a

---

[13] The application leading to the issuance of the '400 patent was filed on May 25, 2017.

predetermined linguistic-based psychological behavioral model to the electronic customer communication data, generating behavioral assessment data by the contact center based on said analyzing, the behavioral assessment data providing a personality type for the analyzed electronic customer communication data, generating a responsive communication based on the generated behavioral assessment data, and providing the responsive electronic communication via the user interface.

(*Id.*, col. 2:45-67)  The concept of establishing a series of steps to objectively analyze a customer service interaction may be inventive where, as here, the claimed steps replace a prior subjective process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) ("Defendants concede an animator's [prior art] process was driven by subjective determinations rather than specific, limited mathematical rules" of the claimed invention).  These alleged improvements are captured in claim 1's recitation of analyzing electronic customer communication data and generating behavioral assessment data based on data mined from social media to objectively assess a call agent's performance and customer satisfaction.  ('400 patent, col. 32:18-43)  Because a factual dispute exists regarding whether the invention "describes well-understood, routine, and conventional activities," *Berkheimer*, 881 F.3d at 1369, I recommend that the court deny CallMiner's motion to dismiss claim 1 of the '400 patent.

## IV.     CONCLUSION

For the foregoing reasons, I recommend that the court DENY CallMiner's motion to dismiss pursuant to Rule 12(b)(6).  (D.I. 18)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right

to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 3, 2020

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE